Marc John Randazza, Esq.
Admitted Pro Hac Vice (FL Bar No. 625566)
2 S. Biscayne Boulevard, Suite 2600
Miami, FL 33131
Phone: (305) 479-2491
Fax: (305) 437-7662
Email: mjrpa@me.com

Mark G. Tratos, Esq.
Nevada Bar No. 1086
tratosm@gtlaw.com
Ronald D. Green, Esq.
Nevada Bar No. 7360
greenro@gtlaw.com
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Clyde Dewitt (Bar No. 9791)
732 South Sixth Street, Suite 100
Las Vegas, NV 89101-6927
Phone: (702) 386-1756
E-fax: (310) 362-8667

Counsel for Defendant BMEZine.Com, LLC.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GREGORY RICKS,<br><br>          Plaintiff,<br><br>vs.<br><br>BMEzine.COM, LLC,<br><br>          Defendant. | Case No.:     2:08-CV-01174-PMP-(GWF)<br><br>**Defendant's Motion for Summary Judgment on Its Counterclaims with Memorandum of Points and Authorities in Support of Motion for Summary Judgment on Its Counterclaims** |

**BMEzine.COM, LLC,**

**Counterclaim Plaintiff,**

v.

**GREGORY RICKS, and**
**GEE WHIZ DOMAINS, INC.**

**Counterclaim Defendants.**

COMES NOW Defendant BMEZine.com, LLC ("BME") and respectfully moves the Court for summary judgment under Federal Rule of Civil Procedure 56 on its counterclaims that Plaintiff has willfully infringed and diluted BME's famous trademark, service mark, and Internet Domain Name bme.com ("Domain Name") in violation of the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), and section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Summary judgment is appropriate where the facts are undisputed and judgment may therefore be cast as a matter of law.  In this case, there is no disputing that Plaintiff Gregory Ricks ("Ricks") knew that his www.bme.com website was profiting from pay-per-click advertisements that were likely to confuse Internet users seeking out one of BMEzine.com, LLC's many websites. It is therefore appropriate to find Ricks liable under both the ACPA and section 43(a).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Legal Standard

A party is entitled to summary judgment when the submissions in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of material fact."  *Id.* at 247-48.  The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 485 U.S. 574, 586 (1986).

/ / /

/ / /

## II.     Facts

This motion concerns the Internet domain name *BME.com* (or the "Domain Name"), which was registered and used by Plaintiff and Counterclaim Defendant Gregory Ricks (herein "Plaintiff" or "Ricks") until a panel of World Intellectual Property Organization ("WIPO") arbitrators deemed his use in bad faith and ordered it transferred to Defendant and Counterclaim Plaintiff BMEzine.com, LLC. See *BMEzine.com, LLC v. Gregory Ricks / Gee Whiz Domains Privacy Service*, Case No. D2008-0882 (WIPO Aug. 21, 2008).[1]  After the WIPO order was issued, Ricks filed the present action seeking to regain control of the Domain Name.   BMEzine.com, LLC filed counterclaims, of which two may be resolved at summary judgment.[2]

### A.     Defendant BMEZine.com, LLC

Defendant BMEzine.com, LLC (hereinafter "Defendant" or "BME"), a business wholly owned and operated by Rachel Larratt, distributes Web-based information about body modification, such as tattoos and piercing.

BME operates multiple websites, each of which bears the "BME" mark (including BMEzine, BMEshop, BMEworld, BME411, BMEvideo, BMEhard, AskBME, BMEink, and TeamBME). Several people have made sworn declarations, both in this action and in the WIPO action that preceded it, that BME is the most well-known media enterprise in that community. See Spec. Exh. 1 at A.  If a website involves tattoos, piercing, or other body art and the term BME, the relevant consuming public would presume that BME owns, controls, sponsors, or otherwise has legally approved of its publication. *Id*.

BME has over 15 years of continuous and widespread use on the Internet (where the websites owned and operated by BME receive millions of daily visitors and BME's flagship site, BMEZine.com, is linked to by 1,216 other websites) as well as near ubiquitous recognition in the

---

[1] As Plaintiff has alleged fraud in that proceeding, the pleadings and exhibits in that proceeding must be considered as part of the record in this case.  The UDRP proceeding file is attached hereto as Special Exhibit 1 (hereinafter, "Spec. Exh. 1"); see also at *Plaintiff/Counterdefendant's First Set of InitialDisclosures*, at 265-485.  Within this Exhibit, there are sub-exhibits, which are Exhibits to the UDRP complaint and the UDRP response.  Hereinafter, for the sake of simplicity, these exhibits (if referred to herein) shall be referenced by their exhibit letter (For example, "Spec. Exh. 1 at A")

[2] If these two counts are resolved in BMEzine, LLC's favor, the relief granted will be complete, thus mooting BMEzine, LLC's additional counterclaims.

relevant channels of trade. See Spec. Exh. 1.[3]   BME has been using the "BME" service mark (hereinafter the "BME mark") in international commerce in connection with tattooing and piercing journalism since as early as 1994, when it was used on an Internet newsgroup, and as such its use pre-dates the World Wide Web. *Id.*[4]   Thereafter, the use of "BME" has spanned across the Internet, and the aforementioned flagship site alone is regularly viewed all across the globe. *Id.*[5]

BME has a registered service mark through the United States Patent and Trademark Office ("PTO") in the term "BME" for the services of "[p]roviding an online interactive database of photos and videos in the field of body art, namely, piercing, tattoos, scarification, subincision, [and] castration." PTO Reg. No. 3579098 (filed Mar. 27, 2008, registered Feb. 24, 2009).  The PTO states the mark's first use in commerce was April 15, 1997, with first use overall years earlier. *Id.*  BME also has a registered service mark in the word mark "BMEZINE.COM" for the services of "[p]roviding an online interactive database of photos and videos in the field of body art." PTO Reg. No. 3634349 (filed Sep. 10, 2008, registered June 9, 2009).   Its first use in commerce was November 9, 2000, with first use overall in 1995. *Id.*

**B.     Plaintiff Gregory Ricks**

Plaintiff Ricks is a notorious cybersquatter. "[C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir.2004)).  In this case, Plaintiff has done both.  The Plaintiff has

---

[3] At "R"; see also, See Spec. Exh. 1 at U.  Also see Plaintiff's Second Set of Disclosures at 142-46 (Declaration of Expert *Allen Falkner* from UDRP); see also *Id* at 147-50 (Declaration of Expert *David Vidra* from UDRP); see also *Id.* at 151-54 (Declaration of Expert *Elayne Angel* from UDRP); and see Spec. Exh. 1 at "I" (Declaration of Expert *Kevin Wimberly* from UDRP).
[4] See Spec. Exh. 1 at "C," and "G."
[5] Spec. Exh. 1 at "R."

"spent millions of dollars acquiring domain names,"[6] and "registered thousands of domain names" – so many that listing them all "would pose and undue and oppressive burden."[7]

On many occasions, Ricks has been adjudged to have had, a bad faith intent in registering and/or using domain names identical or similar to other parties' trademarks, and has been ordered to transfer them to their rightful owners in arbitrations under the Uniform Domain Name Dispute Resolution Policy ("UDRP").[8]  Plaintiff has had to turn over so many domain names, as a result of UDRP decisions, he is unable to estimate how many times this has happened.  See *Deposition of Greg Ricks*, Exhibit B (hereinafter, "Ricks Depo") at 104:10-21.  The list includes:

- *Cedar Trade Assocs., Inc. v. Gregg Ricks*, NAF Case No. 93633 (Nat. Arb. Forum Feb. 25, 2000) (finding bad faith registration and use and ordering transfer of buypc.com);
- *Hunter Fan Co. v. MSS*, NAF Case No. 98067 (Nat. Arb. Forum Aug. 23, 2001) (finding bad faith registration and use and ordering transfer of hunterfans.com; Ricks determined to be principal of respondent);
- *Welch Foods, Inc. v. MSS*, WIPO Case No. D2001-1065 (Dec. 17, 2001) (finding bad faith registration and ordering transfer of welches.com; Ricks listed as "Administrative, Technical, and Billing contact" for respondent);
- *Philip Morris USA Inc. v. Domain Admin*, WIPO Case No. D2005-0108 (Mar. 24, 2005) (finding bad faith registration by Ricks and use and ordering transfer of virginiaslims.com);
- *Abt Elecs., Inc. v. Gregory Ricks*, NAF Case No. 904239 (Nat. Arb. Forum Mar. 27, 2007) (finding bad faith registration and use and ordering transfer of abt.com);
- *Digital Spy Ltd. v. Moniker Privacy Servs. & Express Corp.*, WIPO Case No. D2007-0160 (Apr. 4, 2007) (finding bad faith registration and ordering transfer of digitalspy.com);
- *Lexington Rubber Grp., Inc. v. Gregory Ricks*, NAF Case No. 1047280 (Nat. Arb. Forum Sept. 27, 2007) (finding bad faith registration and use and ordering transfer of lexingtonmedical.com);
- *Rewe Touristik Hotels & Investment GmbH v. Gee Whiz Domains Privacy Servs. & Gregory Ricks*, WIPO Case No. D2008-1342 (Oct. 29, 2008) (finding bad faith registration and use and ordering transfer of lti.com);

---

[6] Steve Green, *Vegas Company Sued Over Web Site Promoting Escorts*, Las Vegas Sun, Aug. 3, 2009, available at http://www.lasvegassun.com/news/2009/aug/03/vegas-company-sued-over-web-site-promoting-escorts/.

[7] See *Plaintiff/Counterdefendant's Responses to Defendant/Counterplaintiff's First Set of Interrogatories*, Response to Interrogatory No. 6.

[8] He has also been the defendant in a number of federal actions for violations of the ACPA.  See Exhibit Z to UDRP Proceeding; and See Exhibit B at 45:8-20.

- *Alfwear Inc. v. Registrant [1370348]: Privacy Admin / Registrant [709764]: Gregory, Ricks*, WIPO Case No. D2008-1522 (Dec. 2, 2008) (finding bad faith use and ordering transfer of kuhl.com); and of course,
- *BMEZine.com, LLC v. Gregory Ricks / Gee Whiz Domains Privacy Service*, WIPO Case No. D2008-0882 (Aug. 21, 2008) (finding bad faith registration and use and ordering transfer of bme.com).

The Plaintiff has not yet been forced to relinquish many other websites he controls that infringe on famous trademarks; and is either, the principal or alter ego, of Gee Whiz Domains, his fellow counterclaim defendant.  Gee Whiz Domains is the registrant of the following cavalcade of questionable domains that infringe upon the intellectual property rights of third parties: barbizion.com; billgates.com; cartmax.com; cnnmmoney.com; exxonmobill.com; epinione.com; googlepagescreator.com;   htpgmail.com;   lufthamsa.com;   machtcom.com;   microsoet.com; microsoftclipart.com; microsotcom.com; msnnb.com; napsterlite.com; newyorktimesbestseller.com; officedepo.com;   snoopdog.com;   toysru.com;   ultimatesurrenderpassword.com;   xmrasdio.com; yahoooe.com; and yahooemai.com.

### C. Ricks' Registered the Domain Name bme.com and Escalated His Knowingly Infringing Use Through the Website While He Sought to Raise the Bidding Price for Sale of the Domain Name.

The infringing Domain Name contains the entirety of BME's registered mark.  Ricks claims that "he" registered the Domain Name on or about March 6, 2000.  [Doc. 27 ¶ 8].[9]  Ricks claims that the Domain Name initially forwarded to _motherboards.com_.  [Doc. 27 ¶ 14]. Plaintiff also claims that the Domain Name then forwarded to _YADA.com_.  [Doc. 27 ¶ 16].  At least as early as March 21, 2004, Plaintiff had actual knowledge of BME's business and trademark.  Plaintiff claims that Shannon Larratt, Rachel Larratt's estranged husband and founder of BME, contacted him on March 21, 2004.  [Doc. 27 ¶ 27].  Sometime after that encounter, Plaintiff began using the Domain

---

[9] However, the evidence shows that it was registered in the name of a corporation, motherboards.com, which was apparently controlled by Plaintiff.  This distinction is, however subtle, not wholly legally irrelevant, as the date of a new registration, per ICANN rules, is a "new registration" under the UDRP, to which Ricks consented upon registration. Nevertheless, even if we assume, *arguendo*, that Plaintiff was in fact the "registrant" of the domain name as far back as March 6, 2000, his bad faith use thereafter is still is in violation of the law.

1    Name as a "pay-per-click" advertising website, a type of website that is ubiquitous on the Internet.[10]

2    See *Deposition of Rachel Larratt (Vol. 2)*, Exhibit AA (hereinafter, "R. Larratt Depo. (2)") at

3    254:11-22.  At least as early as February 24, 2007, Plaintiff began providing a pay-per-click page

4    under the Domain Name featuring advertisements devoted to body modification, displaying photos

5    of body-piercing jewelry, and providing links to body-art sources. See Spec. Exh. 1 at Composite X.

6    The pay-per-click advertisements misdirected valuable Internet traffic that otherwise would have

7    gone to BME's websites.

8         BME has not consented to Ricks' use of its tradename, service mark, or the Domain Name.

9    Rachel Larratt discovered Ricks' infringing use in November 2007. See *Deposition of Rachel*

10   *Larratt (Vol. 1)*, Exhibit A (hereinafter, "R. Larratt Depo. (1)") at 131:5-7.  Ricks modified the

11   website found under the Domain Name a few times thereafter, finally adding body modification

12   photographs and links to "Body Tattoo Pictures" and "Tattoo Kits," photographs of tattoos.

13   Plaintiff's website reached its final form on May 6, 2008, using the Domain Name to earn

14   advertising revenue by providing pay-per-click links to tattoo, body piercing, and other body art

15   related businesses.  See Spec. Exh. 1 at Composite Exhibits X.1-6.

16        A true and correct copy of the website available to the general public under which Plaintiff

17   used the Domain Name is displayed below as it appeared when the UDRP proceeding was filed:

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26

27   ──────────────
     [10] In pay-per-click advertising, "When an Internet user enters [a] domain name in her browser, she is directed to a webpage that lists links to the websites of paying advertisers. If the user clicks on any of these links, then the advertiser

28   pays a fee to the website."  *Southern Co. v. Dauben Inc.*, No. 08-10248, 2009 WL 1011183 (5th Cir. Apr. 15, 2009) (citing *NetQuote, Inc. v. Byrd*, No. 07-CV-00630-DME-MEH, 2008 WL 2552871, at *13 (D. Colo. June 17, 2008).

### III.   Ricks' Use of the BME Domain Name Violated 15 U.S.C. § 1125(d).

Under the ACPA, a person is liable for cyber-piracy to the owner of a mark "without regard to the goods or services of the parties," when that person:[12]

(i)    has a bad faith intent to profit from that mark …; and
(ii)   registers, traffics in, or uses a domain name that –

    (I)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]

    (II)   in the case of a famous mark that is famous at the time of the registration of the domain name….

There is no genuine issue of material fact that would prevent summary judgment on these issues.

/ / /

---

[11] See Spec. Exh.1 at Composite Exhibit X.6; **to juxtapose**, **see also**, Plaintiff's Second Set of Disclosures at pp. 64, 66 (a set of examples showing the front-page of 2 websites (*BMEshop.com*, and *BMEzine.com*) owned, maintained and operated, by Defendant, BMEzine.com LLC, which were submitted by the Plaintiff).
[12] 15 U.S.C. § 1125(d)(1)(A).

### A.    BME Is the Owner of Its Trademarks, Including "BME."

Registration with the PTO is "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1115(a).  BME, which registered and owns the "BME" mark, is entitled to a strong presumption that its mark in "BME" is valid. Moreover, in addition to its registered marks, BME is the owner of common law trademark rights in "BME." "BME" is a famous mark within the body art, tattooing and piercing niche communities, and thus has acquired a strong secondary meaning in the relevant consuming marketplace; that fact is uncontested and supported by Expert Witness Declarations, and made clearly evident through the use of the mark to identify BME in numerous tattoo and body modification print articles.[13] Additionally, the "BME" mark has acquired distinctiveness in the more general marketplace as well, having been used to identify BME in a veritable cornucopia of print articles in the mainstream media, including publications that do not normally focus on subjects in the "Body Modification" or "Body Art" community.  *Id.*[14]  Over 15 years of extensive and continuous use, BMEZine.com, LLC has referred to itself, and been referred to by the many inside and outside the body modification community who know it, as "BME." BME's common law trademark rights in "BME" are incontrovertible.

### B.    Ricks Has Demonstrated His Bad Faith Intent to Profit from the "BME" Mark.

The evidence of Ricks' bad faith is more than sufficient for summary judgment under the ACPA. To prevail, Defendant must establish bad faith intent by a preponderance of the evidence. *Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 227 (4th Cir. 2002) (no heightened pleading standard for bad faith intent under the ACPA).  Plaintiff demonstrated his bad faith intent,

---

[13] See Plaintiff's Second Set of Disclosures at 142-46 (Declaration of Expert *Allen Falkner* from UDRP); see also *Id* at 147-50 (Declaration of Expert *David Vidra* from UDRP); see also *Id.* at 151-54 (Declaration of Expert *Elayne Angel* from UDRP); and see Spec. Exh. 1 at "I" (Declaration of Expert *Kevin Wimberly* from UDRP).  *See also,* Spec. Exh. 1 at "C" and "H".

[14] See Spec. Exh. 1 at "M" and "G" (these exhibits, consisting of a representative sampling of unsolicited print articles, provide irrefutable evidence of the noteworthy attention bestowed upon BME in the mainstream media on a regular basis). For other examples: in 1995, "BME" won a Lydia Award for "Best World-Wide-Website" and "Best Body Art Magazine (any medium)" (see Special Exhibit 1 at Composite Exhibit P); and in July 1998, *Playgirl Magazine* noted that BME is "a good place to learn about genital piercing!" (see *Playgirl Magazine,* July 1998 at p. 42).

if not upon registration, then at least as early as the moment he became aware of his site's infringement on BME's trademarks.  See Ricks Depo at 130-32 & 142-43.  Mr. Ricks himself admitted to being cognizant of experiences of confusion by the consuming public, between his website and the Defendant's.  *Id* at 135:22-136:7.  His bad faith was evidenced thereafter as he continued to use the domain name in an infringing fashion, amplifying the likelihood of confusion with misleading tattooing references and advertisements.  *Id* at 143.

The ACPA includes a nonexclusive list of nine factors a court may assess in determining whether a domain name user has a bad faith intent under 15 U.S.C. § 1125(d)(1)(A):[15]

(I)   the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)   the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)   the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are

---

[15] See also, 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)     the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

Applying those factors in this case would require a finding of Ricks' bad faith intent, because all nine factors support that finding.

**Factors I-IV.**  "The first four factors have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark, and the other five are indicia of bad faith intent."  *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 785 (8th Cir. 2004). The first four factors offer Ricks no support.  Ricks has no trademark registration or other legitimate rights in the domain name, nor in any trademark or service mark identical or similar to the "BME" mark. The domain name does not share Ricks' personal name or initials, nor is it a legal name or commonly-used name for any of Ricks' companies.  Ricks did not offer any goods or services under the name "BME" until he acquired the *BME.com* domain, so Ricks engaged in no prior use (bona fide or otherwise). The Plaintiff's use of *BME.com* was expressly commercial, as a revenue-generating site offering pay-per-click advertisements for services that directly competed with BME and confused Internet users.[16]  Thus the first four enumerated statutory factors do nothing to weigh against a finding of bad faith intent.  See 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IV).

**Factor V.**  The fifth factor concerns the diversion of Internet users away from the trademark owner's web site in a manner intended to harm the goodwill of the mark by creating a likelihood of confusion for commercial gain, tarnishment, or disparagement.  This factor weighs against Ricks, as he sought his commercial gain from the bme.com site at the expense of BME.  "As intent is rarely discernible directly, it must typically be inferred from the circumstances."  *Int'l Bancorp v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 486 (E.D. Va.

---

[16] The Ninth Circuit has recently distinguished bona fide use from a cybersquatter's employment of pay-per-click advertisements on a web site using the infringing domain name.  *Lahoti*, 2009 WL 3807105, at *9 ("Lahoti never used the Domain Name in connection with a bona fide offering of goods and services.  Instead, Lahoti earned income when customers clicked on links when visiting the Domain Name website, some of which directed them to Vericheck's competitors.").  Naturally, intentionally infringing use of a mark cannot constitute bona fide use.

2002).  Ricks' intent was apparent to anyone who saw what he did with the domain, using revenue-generating pay-per-click advertisements that featured links to goods and services closely associated with BME's core services – tattooing and body modification.  When operated by Ricks, from at least June 9, 2008, "the disputed domain name resolved to a website with a photograph of a person drawing a tattoo and a number of click-through links to sites involving tattoo equipment, tattoo pictures, body piercing, body modification, and henna tattoos, and direct links to purchase tattoo kits."  *BMEzine.com, LLC v. Gregory Ricks/Gee Whiz Domains Privacy Service*, WIPO Case No. D2008-0882 at § 4 (Aug. 21, 2008).  Ricks' use of the "BME" mark as a domain name diverted Internet users searching for BME, and his pay-per-click advertisements directed them even further away.  *See Lahoti v. Vericheck, Inc.*, ___ F. 3d ___, No. 08-35001, 2009 WL 3807105, at *9 (9th Cir. Nov. 16, 2009) ("*Lahoti*").

**Factor VI.**  The sixth factor is whether the plaintiff offered to sell or transfer the domain name for financial gain without having the intent to use them in the bona fide offering of any goods or services.  Acting as Ricks' agent, Moniker sought a ransom from BME to relinquish the infringing use and turn over the website.  This was "the Internet version of a land grab to force the rightful owners to pay for the right to engage in electronic commerce under their own name." *Interstellar Starship Services v. Epix*, 304 F.3d 936, 946 (9th Cir. 2002). While Ricks did offer a service on the website, it was not a bona fide service – rather, it was the illegitimate gathering of advertising revenue by piggybacking his site to BME's hard-earned mark. The creation of value in a trademark requires 'the expenditure of great effort, skill and ability' and a competitor should not be permitted to take a 'free ride' on the trademark owner's good will and reputation." 1 *McCarthy on Trademarks,* § 2:30, at 2-54 (quoting *Smith v. Chanel, Inc.,* 402 F.2d 562, 568 (9th Cir. 1968)).  Such trademark abuse is strongly disfavored by the ACPA. "One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6[h] Cir. 2004).  Even if Moniker's offer on Ricks' behalf is not implicitly attributed to Ricks (as it should be); Ricks' personal plea to Ms. Larratt to sell the Domain Name for $100,000 must constitute an offer for financial gain.  Thus, the sixth factor supports a finding of bad faith.

1    **Factor VII.**  The seventh factor is whether the plaintiff provided material and misleading

2    false contact information when applying for the registration for the domain name.  Ricks did so,

3    enlisting Moniker to register the Domain Name in his place to conceal his identity.  Worse, Ricks

4    employed Moniker as an intermediary for its ransom negotiations; it was not until BME brought its

5    UDRP action that Ricks' identity was revealed.  Ricks also apparently sought to mask the true

6    identity of his company through a shell game of aliases and internal ownership transfers.[17]  This

7    factor also supports a conclusion of bad faith.

8    **Factor VIII.**  The eighth factor addresses the serial nature of Ricks' cybersquatting. This

9    factor supports a finding of bad faith upon the registration or acquisition of multiple domain names

10   with the knowledge that they are identical or confusingly similar to the distinctive marks of others.

11   "Congress has said that in evaluating bad faith, courts may consider a person's prior cybersquatting

12   activities." *Lahoti*, 2009 WL 3807105, at *9. "This factor was intended by Congress to target the

13   'practice known as 'warehousing,' in which a cyber-pirate registers multiple domain names —

14   sometimes hundreds, even thousands — that mirror the trademarks of others.'"  *Harrods*, 302 F.3d

15   at 239 (quoting H.R. Rep. No. 106-412, at 13 & citing Sen. Rep. No. 106-140, at 16).

16   Ricks has spent millions of dollars to register thousands of domain names over the years.[18]

17   Multiple registrations are not sufficient proof of cybersquatting, when viewed in isolation.  "While

18   the registration of multiple domain names is a factor that a court may consider in determining bad

19   faith, Congress warned that the ACPA 'does not suggest that the mere registration of multiple

20   domain names is an indication of bad faith." *Harrods*, 302 F.3d at 239 (quoting H.R. Rep. No. 106-

21   412, at 13 & citing Sen. Rep. No. 106-140, at 16).  But what Ricks *does* with his sites is more than

22   mere innocent registration.   He has been repeatedly found to have registered or used domain names

23   in bad faith in administrative decisions requiring him to turn them over to the rightful trademark

24   holders.  Ricks directly offered to sell the Domain Name to BME.  He has also previously offered to

---

[17] See Exhibit E (UDRP Decision) (wherein, the WIPO arbitration panel unanimously found "… circumstances here suggest that Respondent, a seasoned domainer who has been the subject of many Policy proceedings, made its latest transfer, from one privacy service to another, to conceal his identity as long as possible.  This transfer occurred a few months after Complainant's filing its service mark application for BME, and Respondent's current use for a click-through site began immediately thereafter. Respondent has offered no other reason for this or any other transfer, suggesting something other than a pattern of mere renewals." *BMEZine.com, LLC v. Ricks*, WIPO Case No. D2008-0882 (footnotes omitted).

[18] See Steve Green, *Vegas Company Sued Over Web Site Promoting Escorts*, Las Vegas Sun, Aug. 3, 2009, available at http://www.lasvegassun.com/news/2009/aug/03/vegas-company-sued-over-web-site-promoting-escorts/.

1    sell other domain names that he has registered that are identical or similar to the names of well-

2    known businesses and products, a sufficient independent reason to apply the eighth factor against

3    him.  See *E. & J. Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002).

4          The Ninth Circuit recently affirmed a district court's finding of bad faith when a

5    cybersquatter "earned income when customers clicked on links when visiting the Domain Name

6    website, some of which directed them to [the legitimate mark holder]'s competitors." *Lahoti*, 2009

7    WL 3807105, at *9.  That describes Ricks' business model in this case.  Like Ricks, the

8    cybersquatter in Lahoti sought to sell the domain name to the proper trademark holder for an

9    exorbitant sum (though in that case, the ransom sought was only $72,500, less than half the

10   $160,000 Ricks' agent sought from Defendant).  And like Ricks, the defendant in that case was a "a

11   repeat cybersquatter who has registered hundreds of domain names resembling distinctive or

12   famous trademarks and has been admonished by judicial bodies for doing so."[19]  *Id.*  Such "behavior

13   shows 'the sort of misconduct that Congress sought to discourage' by enacting the ACPA."  *Id.*

14   (quoting *Virtual Works, Inc. v. Volkswagen of Am.*, 238 F.3d 264, 270 (4th Cir. 2001)).  Under the

15   eighth statutory factor, Ricks' repeat cybersquatting raises an inference of bad faith.  See, e.g.,

16   *Shields v. Zuccarini*, 254 F.3d 476, 485 n.5 (3d Cir. 2001) (finding bad faith under the eighth factor

17   where domain name registrant's "pattern of behavior is consistent with a bad faith intent to profit").

18         **Factor IX.**  The ninth factor concerns the extent to which the mark incorporated in the

19   domain name registration is distinctive or famous.  As discussed below, it is both, so this factor also

20   supports a finding of bad faith.

21         **Other evidence of bad faith intent.**  While the nine statutory factors all augur in favor of a

22   finding of Ricks' bad faith intent, the factors are "non-exhaustive guideposts." *N. Light Tech., Inc.*

23   *v. N. Lights Club*, 236 F.3d 57, 64 (1st Cir. 2001).  "[T]he most important grounds for finding bad

24   faith are the unique circumstances of the case, which do not fit neatly into specific factors

25   enumerated by Congress." *Interstellar Staship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 947-48 (9th

26   Cir. 2002) (internal quotations and citations omitted).  There are few unique circumstances in this

27

28   _____

[19] Also like Ricks, the cybersquatter in *Lahoti* lost a UDRP decision and sought a declaratory judgment that he had not violated the Lanham Act with a website that sought revenue from pay-per-click advertisements.  Ricks further seeks to subvert the purpose of the Anticybersquatting Consumer Protection Act by using it as a shield for his cybersquatting..

- 14 -

case, as Ricks and his fellow cybersquatters have made cases like this one all too common.  But one further circumstance bears discussion:  Ricks' habit of transferring ownership of the Domain Name through a series of corporate shell names.  His most recent registration of the domain name came while BME had a pending PTO application for the mark "BME" (which has since been granted). The UDRP panel determined that each transfer of ownership between entities Ricks controlled constituted a new registration, and applied its finding of bad faith intent not just to Ricks' use but also to his latest registration. *BMEzine.com, LLC v. Gregory Ricks / Gee Whiz Domains Privacy Service*, Case No. D2008-0882, at § 6.B. The WIPO panel's finding is instructive. A WIPO panel's findings under the UDRP are reviewed *de novo* under the Lanham Act, *Barcelona.com, Inc.*, 330 F.3d at 626, but they may provide a "confirmatory context" for other evidence.  *Palm Bay Imports, Inc. v. Vueve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1376 (Fed. Cir. 2005). And the WIPO panel provides ample confirmation of the evidence of bad faith:

> … circumstances here suggest that Respondent, a seasoned domainer who has been the subject of many Policy proceedings, made its latest transfer, from one privacy service to another, to conceal his identity as long as possible.  This transfer occurred a few months after Complainant's filing its service mark application for BME, and Respondent's current use for a click-through site began immediately thereafter. Respondent has offered no other reason for this or any other transfer, suggesting something other than a pattern of mere renewals.

> In May 2008 Respondent admittedly had been aware for some time of Complainant and its interest in the disputed domain name, as he participated in correspondence about a possible sale of it to Respondent as early as 2004.  Any registration by Respondent after that date could thus not have been made in good faith and could not have conferred on him a legitimate interest in the disputed domain

name. Respondent's use of it immediately after its registration in 2008, described above, betrays his knowledge of Complainant and its mark, and thus evidences bad faith requirements in both registration and use.

*BMEZine.com, LLC v. Ricks*, WIPO Case No. D2008-0882 at ¶ 6.B. (footnotes omitted).[20]

But Ricks is liable under the ACPA even if his displays of bad faith toward BME did not come until after he registered the Domain Name, because ample evidence shows that he eventually manifested that bad faith on his infringing website. "Evidence of bad faith may arise well after registration of the domain name." *Lahoti*, 2009 WL 3807105, at *9.

### C.   The "BME" Mark Was Both Distinctive and Famous When Ricks Registered the Domain Name.

The "BME" mark was both distinctive and famous at the time Ricks registered the Domain Name, qualifying for protection under 15 U.S.C. § 1125(d)(1)(A). The distinctiveness of the mark and its fame in the relevant channels of trade are uncomplicated, incontrovertible and undeniable. This is attested to in the Declarations of body piercing and body art experts.[21] These experts confirm the obvious – that the "BME" mark can only identify BMEzine.com, LLC, and any other use of the mark will result in a strong likelihood of confusion in the relevant marketplace.

In determining whether a mark is distinctive or famous, a court may consider the following factors:

(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels

---

[20] See Exhibit E.
[21] See Plaintiff's Second Set of Disclosures at 142-46 (Declaration of Expert *Allen Falkner* from UDRP); see also *Id* at 147-50 (Declaration of Expert *David Vidra* from UDRP); see also *Id.* at 151-54 (Declaration of Expert *Elayne Angel* from UDRP); and see Spec. Exh. 1 at "I" (Declaration of Expert *Kevin Wimberly* from UDRP). *See also,* Spec. Exh. 1 at "C" and "H".

of trade for the goods or services with which the mark is used; (F) the
degree of recognition of the mark in the trading areas and channels of
trade used by the marks' owner and the person against whom the
injunction is sought; (G) the nature and extent of use of the same or
similar marks by third parties.

15 U.S.C. § 1125(c)(1). These factors all support a finding that the BME mark was, and remains,
distinctive and famous.

### 1.    The "BME" Mark Has Inherent or Acquired Distinctiveness.

"The general presumption of validity resulting from federal registration includes the specific
presumption that the trademark is not generic." *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250,
1254 (9th Cir. 1982). "A party moving for summary judgment is entitled to the benefit of any
relevant presumptions that support the motion," *Lahoti*, 2009 WL 3807105, at *8 (quoting *In re
Patent & Trademark Servs. Inc*, 49 U.S.P.Q.2d 1537, 1539 (T.T.A.B. 1998).

### 2.    The "BME" Mark Is Famous.

A company's "extensive advertising, length of time in business, public recognition, and
uniqueness" all strengthen its trademarks. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175,
1179 (9th Cir. 1988). Each of these factors shows that the BME trademark is famous and strong.
BME has operated and promoted its many Internet sites, named with and prominently displaying the
"BME" mark, continuously over the last 15 years. The trademark is recognized by consumers in
vast numbers, and is associated with the BME brand. As purveyors of the only body modification
'e-zine, Plaintiff is surely unique.

Despite (or more likely, because of) the strength of Plaintiff's mark, Ricks infringed on it,
profiting from the confusion it sowed. The similarity between the Domain Name (*BME.com*) and
BME's registered trademarks (BME and BMEZINE.COM) is not limited to their names, nor to the
fact that Plaintiff marketed advertising directly to Defendant's customer base, offering
complementary goods and/or services to those on Defendant's bmezine.com. (*Ultrapure Sys., Inc.*

- 17 -

*v. Ham-Let Grp.*, 921 F. Supp. 659, 663 (N.D. Cal. 1996) ("Where goods are related or complementary, the danger of consumer confusion is heightened.")  The overall impression given by Ricks' site was of a haphazard mélange of pictures and links related to tattooing and body modification.[22]  This fact is a double-edged sword for Ricks.  First, it shows that his website was infringing, and his site's trend toward ever-greater infringement reveals his bad faith intent. Second, it shows that Ricks' use of the site was likely to harm BME, by presenting to Internet users seeking BME, a shoddy, bare-bones, inferior knockoff of BME's finely designed, information-rich websites, but under a Domain Name embodying BME's mark, leading unsuspecting users to wonder whether BME had suddenly gone dramatically downhill.  This, too, demonstrates his bad faith intent.

**D.      Ricks Does Not Merit the ACPA's Safe Harbor Provision for Lawful Intent.**

The ACPA's safe harbor provides that "[b]ad faith intent … shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  This provision speaks not of "*registration* of a domain name," but of "*use* of a domain name."  It is therefore irrelevant whether Ricks registered the Domain Name in good faith, believing it was lawful (though there is ample reason to doubt he did so).  What matters, for purposes of determining qualification for the safe harbor, is whether he *reasonably* believed his use was lawful.  As discussed above, he could not have held such a belief reasonably when he set out to accelerate the infringing use of the "BME" mark by emphasizing references to matters pertinent to BME's customers.  This safe harbor cannot apply to Ricks, a serial cybersquatter who had full knowledge of his infringing use and proceeded to escalate that infringement regardless.

Ricks' bad faith intent precludes him from finding refuge in the safe harbor.  "All but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior. To hold that all such individuals may qualify for the safe harbor would frustrate Congress' purpose by artificially limiting the statute's reach. We do not think Congress intended the safe harbor to

---

[22] See Spec. Exh. 1 at X.6; **to juxtapose**, **see also**, Plaintiff's Second Set of Disclosures at pp. 64, 66 (a set of examples showing the front-page of 2 websites (*BMEshop.com*, and *BMEzine.com*) owned, maintained and operated, by Defendant, BMEzine.com LLC, which were submitted by the Plaintiff).

1  protect defendants operating, at least in part, with unlawful intent." *Virtual Works, Inc. v.*

2  *Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).

3      The Ninth Circuit recently gave the conclusive word on determining whether a cybersquatter

4  qualifies for the bad faith safe harbor:

5      Lahoti argues that he is entitled to protection under the bad faith safe

6      harbor because he reasonably believed his use of the Domain Name

7      was lawful. *See* 15 U.S.C. § 1125(d)(1)(B)(ii). However, courts

8      should "make use of this 'reasonable belief' defense very sparingly

9      and only in the most unusual cases." *Audi AG v. D'Amato*, 469 F.3d

10     534, 549 (6th Cir. 2006) (quoting 4 McCarthy on Trademarks §

11     25:78)). Otherwise, the defense would "undermine the rest of the

12     statute" because "[a]ll but the most blatant cybersquatters will be able

13     to put forth at least some lawful motives for their behavior." *Virtual*

14     *Works*, 238 F.3d at 270. We agree with the Fourth Circuit, which, in

15     affirming a summary judgment determination of bad faith, has held

16     that "[a] defendant who acts even partially in bad faith in registering a

17     domain name is not, as a matter of law, entitled to benefit from the

18     [ACPA's] safe harbor provision." *Id*. As we see the record, there is no

19     genuine appellate issue on Lahoti's bad faith. He has made his

20     cybersquatter bed and now cannot persuasively challenge the district

21     court's conclusion that he must lie in it. …

22     A reasonable person in Lahoti's position—that is, a reasonable person

23     who had previously been declared a cybersquatter in a judicial

24     proceeding—should have known that his actions might be unlawful.

25     Lahoti has previously advanced, unsuccessfully, the same trademark

26     defenses he argues here, including the claim that the mark at issue

27     was only descriptive and that he is entitled to the safe harbor. Lahoti's

28     failed defenses in these other cases make it unlikely that he

legitimately believed that his use of the Domain Name was wholly lawful in this case. *See Coca-Cola Co. v. Purdy,* 382 F.3d 774, 788 (8th Cir. 2004) (rejecting the defendant's safe harbor defense because the defendant had previously been enjoined in a prior Internet trademark case while advancing a similar defense). Although Lahoti may have believed that Vericheck's Disputed Mark was descriptive, his use of the Domain Name to link to Vericheck's competitors and his willingness to sell the Domain Name only for an exorbitant profit are quintessential cybersquatting practices. Lahoti acted at least "partially in bad faith" in gambling that the district court would agree with his interpretation of trademark law, and he knew or should have known that he would risk cybersquatting liability if his gamble failed. *Virtual Works*, 238 F.3d at 270. Lahoti is not entitled to the safe harbor. *Lahoti*, 2009 WL 3807105, at *10.

For the same reasons -- multiple rulings against him; linking from the bme.com site to tattoo advertising sites other than BMEzine.com; withholding sale of the infringing Domain Name for any less than $100,000 -- no "safe harbor" awaits Ricks here.  Given Plaintiff's serial trademark infringements, he should have known that his use of bme.com was unlawful. In light of his deposition testimony, he could not have legitimately believed that his conduct was lawful.  He has made his bed and must lie in it.

## IV.     Ricks' Use of the Domain Name Also Violated Section 43(a) of the Lanham Act.

"Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services."  *Waits v. Frito-Lay, inc.*, 978 F.2d 1093, 1106 (9th Cir. 1992).  Liability for trademark infringement attaches when a person uses in commerce "on or in connection with goods or services … any work, term, name, symbol or device … which is likely to cause confusion … as to the origin, sponsorship or approval" of the goods and services.  15 U.S.C. § 1125(a)(1).  The purpose of the Lanham Act's trademark protections "is to avoid confusion in the marketplace by

allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.  Trademark law aims to protect trademark owners from a false perception that they are associated with or endorse a product."  *Mattel v. Walking Mt. Prod.*, 353 F.3d 792, 806 (9th Cir. 2003).

To make out a case under Section 43(a) of the Lanham Act, a party must establish that it owns valid marks whose similarity to other marks is likely to confuse the public as to the source of the products or services.  See *Caesars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1196 (D. Nev. 2003). The "BME" mark's ownership by BME; its validity; and its similarity to the Domain Name bme.com have all been conclusively addressed above.  This leaves open only one issue before summary judgment may be granted: likelihood of confusion.

"The core element of trademark infringement is the likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  "[T]he ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks."  *New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979). "Likelihood of confusion exists 'whenever consumers are likely to assume that a mark is associated with another source' because of similarities between two marks." *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1234 (D. Or. 2007) (quoting *Acad. Of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir 1991)).

To help determine if a likelihood of confusion exists, courts in the Ninth Circuit review eight factors, as first articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979): (1) Strength of the mark; (2) Proximity of the goods; (3) Similarity of the marks; (4) Evidence of actual confusion; (5) Marketing channels used; (6) Type of goods and the degree of care likely to be exercised by the purchaser; (7) Defendant's intent in selecting the mark; and (8) Likelihood of expansion of the product lines. *Id.* at 348-49.  This *Sleekcraft* list of factors, "while perhaps exhausting, is neither exhaustive nor exclusive.  Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  In the context of marks used on the Internet, the Ninth Circuit further focuses the analysis on Factors 2, 3, and 5: "the similarity of marks, the

relatedness of product offerings, and the overlap in marketing and advertising channels," or the simultaneous use of the web as a marketing channel. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). If those three factors suggest that confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid finding infringement. *See Interstellar Starship Servs. v. Epix, Inc*., 304 F.3d 936, 942 (9th Cir. 2002); *Perfumebay.com, Inc. v. eBay, Inc,* 506 F.3d 1165, 1173 (9th Cir. 2007). In this case, a review of either the eight *Sleekcraft* factors or the *Brookfield Communications* trinity leaves standing no genuine issue of material fact on the question of "whether the similarity of the marks is likely to confuse customers about the source of the products." *E. & J. Gallo Winery*, 967 F.2d at 1290.

**A.    The *Sleekcraft* Factors Support a Finding of Likelihood of Confusion.**

**Factor 1: Similarity of the Marks**

In determining the similarity of marks, a court must examine the marks in their entirety as they appear in the marketplace along with the relevant appearance, sound and meaning. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998). Here, Plaintiff used the "BME" mark in its entirety, with no variation in appearance or sound, and adjusted its website to heighten the suggestion that BME was the true source.  This is more proof than needed: absolute identity between the marks is not necessary for a finding of consumer confusion. *See Washington Speakers Bureau Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488, 497 (E.D. Va. 1999).

Confusing similarity of marks may also be established under the "Family of Marks" doctrine, under which the cumulative effect of BME's joint registration of so many marks with the "BME-" prefix gives birth to a set of rights whose whole is greater than the sum of its parts. A trademark owner may use a number of marks with a common feature or "surname" that is distinctive enough to be recognized by the consuming public causing them to associate such derivative marks with the trademark owner. *See Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir.1992) ("[A]pplication of the doctrine requires a showing that the family feature or 'surname' is distinctive enough to trigger recognition 'in and of itself'") (citation omitted). "A

family of marks is a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the consuming public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991).  A "Family of Marks" will be found upon a showing that the designation constituting the common feature or "surname" of the family is in fact recognized by the public as a trademark in and of itself. *Primedia Intertec Corp. v. Technology Marketing Corp.*, 35 F. Supp. 2d 809, 817 (D. Kan. 1998).  The evidence in the record establishes BME's right not only to its BME mark, but to a family of registered and common law marks that share the prefix "BME-."

Thus, the similarity factor weighs strongly in BME's favor.

**Factor 2: Relatedness of the Services**

The more related the services, the greater the danger that the public will incorrectly assume that there is a connection between the producers, despite the fact that no relationship exists. *See Sleekcraft*, 599 F.2d at 350 (citation omitted). "'Complementary products, or services, are particularly vulnerable to confusion.'" *Id.* (citing *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970)).

Ricks' initial complaint includes a count for trademark infringement against BME, apparently conceding this factor. [Doc. 1 ¶¶ 5, 37]. The two websites offered exactly the same services – providing information about tattooing, piercing, and body modification.  It is irrelevant that Plaintiff's site may have initially involved unrelated services.   "Congress intended the cybersquatting statute to make rights to domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."  *Storey v. Cello Holdings*, 347 F.3d 370, 385 (2d. Cir. 2003).  Plaintiff modified BME.com to ensure that the services it provided were difficult to distinguish from those offered under the BME mark.  Thus, the relatedness of services factor also weighs strongly in favor of BME.

**Factor 3: Strength of the Mark**

The strength of a mark refers to "the distinctiveness or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly

1    anonymous source." *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502, 512

2    (E.D.N.Y.1975). In determining the distinctiveness of a mark, courts consider two factors: "its

3    inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps, Inc. v.*

4    *Vandam, Inc.*, 159 F.3d 739, 743-44 (2d Cir.1998). "Marks are often classified in one of five

5    categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or

6    (5) fanciful." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th

7    Cir.1998). Marks that are inherently distinctive such as arbitrary, fanciful or suggestive marks do

8    not require proof of secondary meaning in order to be protected. *See Two Pesos, Inc. v. Taco*

9    *Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A descriptive mark,

10   however, can become protectable "provided that it has acquired 'secondary meaning' in the minds

11   of consumers, *i.e.*, it has become distinctive of the trademark applicant's goods in commerce."

12   *Filipino*, 198 F.3d at 1147.

13       Arbitrary and fanciful marks are strong marks, and are afforded greater protection. *See*

14   *Brookfield*, 174 F.3d at 1058. Fanciful marks are "coined" terms that are invented or selected for the

15   sole purpose of functioning as a trademark. *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d

16   694, 700 (2d Cir. 1961). Arbitrary marks are words commonly used in the English language, but

17   when used with the goods or services in issue, neither suggest nor describe any ingredient, quality

18   or characteristic of those goods or services. *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609,

19   611 (7th Cir. 1965).

20       A "suggestive" term suggests rather than describes an ingredient, quality, or characteristic of

21   the goods and requires imagination, thought, and perception to determine the nature of the goods,

22   while "descriptive" term specifically describes a characteristic or ingredient of an article or service.

23   *Abercrombie & Fitch*, 537 F.2d at 10-11. For example, ACTION SLACKS was found to be merely

24   suggestive for pants. *See Levi Strauss & Co. v. R. Josephs Sportswear*, 28 U.S.P.Q.2d 1464, 1993

25   WL 444262 (Trademark Tr. & App. Bd.1993). Similarly, the mark CITIBANK for an urban bank

26   was found to be suggestive, not requiring proof of a secondary meaning. *See Citibank, N.A. v.*

27   *Citibanc Group, Inc.*, 724 F.2d 1540 (11th Cir.1984).

28

"Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Kendall-Jackson Winery*, *supra,* 150 F.3d at 1047 n. 8 (emphasis omitted); *see also Brookfield*, *supra*, 174 F.3d at 1058 n.19 ("Descriptive terms directly describe the quality or features of the product."). A suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, . . . the mark does not describe the product's features, but suggests them." *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8.

Widespread use of a term by others to describe the same services or goods may serve as confirmation of the descriptiveness of a term.  *See Entrepreneur Media v. Smith*, *supra*, 279 F.3d 1135, 1143 (9th Cir. 2002).  However, the converse is also true.  *See Sleekcraft*, *supra*, 599 F.2d at 349 (commenting on the lack of evidence that "others have used or desire to use Slickcraft [the trademarked word] in describing their goods"). The fact is, there is not a single other publication or business in the tattoo, piercing, or body modification industry that uses BME to describe its goods. See Declaration of Rachel Larratt at ¶ 11;[23] see also Spec. Exh. 1.[24]

The BME mark is presumed to be valid and not generic by virtue of its PTO registration. *See*, *e.g.*, *K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005).  See also Exhibit G; Exhibit H; and Exhibit I (BME's trademark registrations).

The BME mark is clearly suggestive, if not arbitrary.  However, even if it is only descriptive, the record is replete with evidence of secondary meaning, which would render the mark protectable.  The strength of the mark at least tips in BME's favor, if not heavily.

**Factor 4: Actual Confusion**

Evidence of actual confusion is not required to establish a violation of the Lanham Act. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc*., 944 F.2d 1446, 1457 (9th Cir. 1991); *Caesars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1199 (D. Nev. 2003). However, when actual confusion is shown, then the likelihood of confusion test has been met.

---

[23] See Spec. Exh. 1 at "U".
[24] See Plaintiff's Second Set of Disclosures at 142-46 (Declaration of Expert *Allen Falkner* from UDRP); see also *Id* at 147-50 (Declaration of Expert *David Vidra* from UDRP); see also *Id.* at 151-54 (Declaration of Expert *Elayne Angel* from UDRP); and see Spec. Exh. 1 at "I" (Declaration of Expert *Kevin Wimberly* from UDRP).

There is no greater evidence of a likelihood of confusion than actual confusion. "Evidence of actual confusion constitutes persuasive proof that future confusion is likely." *Thane Int'l., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (internal quotation marks omitted). As previously stated, the BME has evidence not only of a likelihood of confusion, but also of actual confusion amongst persons that attempt to identify BME's website. See Exhibits J *through* Q (showing actual confusion). In these transcripts, a user attempts to tell another about Defendant's website but directs them instead to Domain Name. See Exhibit J (showing actual confusion by consumers trying to go to, or direct others, to Defendant's main website, *BMEzine.com*, but instead going to, or directing others to Plaintiff's infringing website, *BME.com*). Mr. Ricks himself admitted to being cognizant of experiences of confusion by the consuming public, between his website and the Defendant's.[25] This is clear evidence that actual persons have in fact been confused by Plaintiff's use of BME. While the *sine qua non* of a trademark infringement case is "likelihood of confusion," the best evidence of a likelihood of confusion is evidence of the actual confusion that has already occurred. *See Sardi's Rest. Corp. v. Sardie,* 755 F.2d 719, 724 (9th Cir. 1985) (evidence of actual confusion is strong proof of likelihood of confusion).

**Factor 5: Marketing Channels**

The marketing channels used by the parties are identical – they both market their services on websites on the Internet. Plaintiff loses this factor, as well.

**Factor 6: Type of Goods and Degree of Care Exercised by the Consumer**

While consumers may exercise a heavy degree of care in selecting tattoos and piercings, consumers do not tend to exercise great care when selecting informative websites. *Cf. Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004) ("Whereas a consumer purchasing an automobile will exercise great care, a consumer searching for information about automobiles on the internet may exercise little care and will click on all information about automobiles."). Given the initial interest confusion that is likely in this case, it is most likely that a significant number of consumers would have arrived at BME.com, presumed that BME had "gone

---

[25] See Ricks Depo. at 135:22-136:7.

1  downhill" and either clicked through, or looked elsewhere for their information.  This factor at least
2  leans heavily in BME's favor.

3  **Factor 7: Plaintiff's Wrongful Intent**

4  A plaintiff need not prove wrongful intent to show trademark infringement. *Brookfield*, 174
5  F.3d at 1059. However, where it is shown that the alleged infringer knowingly infringed upon the
6  senior user's mark, courts will presume that it can achieve its purpose in deceiving the public.
7  *Sleekcraft*, 599 F.2d at 354.

8  Plaintiff admits awareness of BME (and *arguendo* BME's intellectual property rights) as
9  early as 2004. [Doc. 27 ¶¶ 27-29].  Despite this fact, he progressively upgraded his website from
10 mildly infringing to clearly infringing, culminating with his revision in May 2008.  This course of
11 conduct directly supports the conclusion that Plaintiff's actions were undertaken with bad faith
12 intent, as the WIPO panel found, and as discussed extensively above.  Ricks' bad faith intent to
13 profit from this confusion – readily inferable from his confessed awareness of the misleading links
14 displayed on his website and his refusal to redress the confusion upon BME's repeated requests – is
15 strong evidence to support a finding that such confusion was in fact likely.  *Interstellar Starship*
16 *Services, Ltd. v. Epix*, 184 F.3d 1107, 1111 (9th Cir. 1999).  "[T]he alleged infringer's judgment as
17 to what is likely to be confusing is relevant because it may well be accurate." *Entrepreneur Media*,
18 279 F.3d 1135, 1148 (9th Cir. 2002). The wrongful intent factor weighs strongly against Plaintiff.

19 **Factor 8: Product Expansion**

20 While this factor might be important in other cases, in this one, there is no likelihood that
21 either party will expand into the other's turf; they've already occupied the same turf.   It is
22 immaterial.

23 **The *Sleekcraft* Factors Together**

24 Based on a consideration of the *Sleekcraft* factors, the Court should find that the identity of
25 the trademarks, the relatedness of the websites, the relative strength of Plaintiffs' mark in the
26 relative marketplace, the identical marketing channels used by the parties, and Plaintiff's bad faith,
27 evidence a likelihood of confusion.  Plaintiff loses on all seven of the relevant *Sleekcraft* factors.

28

**B.      Ricks' Use of the Domain Name Invited Initial Interest Confusion.**

Plaintiff's use of BME's marks invites a likelihood of user confusion under the doctrine of initial interest confusion. *See Interstellar Starship Services, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1110 (9th Cir.1999).  Initial interest confusion results when a party uses the trademark of another "in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'" *Brookfield*, *supra*, 174 F.3d at 1062 (quoting *Dr. Seuss Enters. v. Penguin Books*, 109 F.3d 1394, 1405 (9th Cir.1997)). Initial interest confusion exists where an Internet user would be confused upon arrival at an infringing web page.  Plaintiff's use of the Domain Name initially confuses consumers who expect to find BME at that web address. A website that intends to make click-through fees on links that pertain to body art could only have unjustly benefited by associating itself with the best known body art publication in the world.

"To evaluate the likelihood of confusion, including initial interest confusion, the so-called *Sleekcraft* factors provide non-exhaustive guidance."  *Interstellar*, 304 F.3d at 942 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346 (9th Cir. 1979).  Therefore, the evidence of a likelihood of confusion detailed above also supports a finding of that initial interest confusion was likely.

### CONCLUSION

For the foregoing reasons, BME respectfully requests that the Court grant this motion for summary judgment.

Dated: December 18, 2009.                                    Respectfully submitted,
                                                                                MARC J. RANDAZZA
                                                                                RONALD D. GREEN, JR.
                                                                                CLYDE DeWITT

                                                                                By:   /s/ Ronald D. Green, Jr.
                                                                                Ronald D. Green, Jr.
                                                                                GREENBERG TRAURIG, LLP
                                                                                3773 Howard Hughes Pkwy., Suite 400N
                                                                                Las Vegas, Nevada  89169

                                                                                Counsel for Defendant Bmezine.com, LLC

1

## **PROOF OF SERVICE**

I hereby certify that on December 18, 2009, I caused to be served a copy of the foregoing CONCISE STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT to all counsel of record via the Court's electronic filing system.

By:   /s/ Cynthia L. Ney

An employee of Greenberg Traurig, LLP