1

2

3

4                        UNITED STATES DISTRICT COURT

5                            DISTRICT OF NEVADA

                                    * * *
6
    GREGORY RICKS,                        )
7                                         )
              Plaintiff/Counterdefendant, )        2:08-CV-01174-PMP-GWF
8                                         )
     v.                                   )
9                                         )
    BMEZINE.COM, LLC,                     )         ORDER
10                                        )
              Defendant/Counterclaimant.  )
11  _____)
    BMEZINE.COM, LLC,                     )
12                                        )
              Third Party Plaintiff,      )
13                                        )
    v.                                    )
14                                        )
    GEE WHIZ DOMAINS PRIVACY              )
15  SERVICE,                              )
                                          )
16            Third Party Defendant.      )
    _____)
17

18            Presently before the Court is Plaintiff/CounterDefendant Gregory Ricks'

19  ("Ricks") and CounterDefendant Gee Whiz Domains, Inc.'s ("Gee Whiz") Motion for

20  Partial Summary Judgment (Doc. #55), filed on December 18, 2009.

21  Defendant/Counterclaimant BMEzine.com, LLC filed an Opposition (Doc. #70) on January

22  4, 2010.  Ricks and Gee Whiz filed a Reply (Doc. #106) on January 14, 2010.

23            Also before the Court is Third Party Defendant Gee Whiz Domains, Inc.'s

24  Motion for Summary Judgment (Doc. #56), filed on December 18, 2009.  Defendant filed

25  an Opposition (Doc. #68) on January 4, 2010.  Gee Whiz filed a Reply (Doc. #107) on

26  January 14, 2010.

1    Also before the Court is Defendant's Motion for Summary Judgment on Its

2  Counterclaims (Doc. #57/Doc. #61), filed on December 18, 2009.  Ricks and Gee Whiz

3  filed an Opposition (Doc. #94) on January 5, 2010.  Defendant filed a Reply (Doc. #112) on

4  January 15, 2010.

5    Also before the Court is Defendant's Motion for Summary Judgment (Doc.

6  #59/Doc. #62), filed on December 18, 2009.  Ricks and Gee Whiz filed an Opposition (Doc.

7  #95) on January 5, 2010.  Defendant filed a Reply (Doc. #110) on January 15, 2010.

8    Also before the Court is Plaintiff's Motion to Strike (Doc. #67), filed on

9  December 28, 2009.  Defendant filed an Opposition (Doc. #97) on January 14, 2010.  Ricks

10  and Gee Whiz filed a Reply (Doc. #119) on January 25, 2010.

11  **I.  BACKGROUND**

12    **A.  Plaintiff Ricks and bme.com**

13    Plaintiff Ricks is the owner of thousands of domain names on the Internet,

14  including the domain name in dispute in this matter, bme.com.  (Pl.'s Mot. Partial Summ. J.

15  (Doc. #55), Ex. A ["Ricks Decl."] at 2; Exs. in Support of Def.'s Mots. Summ. J. (Doc.

16  #65) ["Def.'s Exs."], Ex. B at 123.)  Beginning in approximately 1996, Ricks concluded

17  that short, memorable domain names would be a valuable resource on the Internet.  (Ricks

18  Decl. at 2.)  Ricks therefore spent millions of dollars acquiring domain names.  (Id.)  On

19  March 6, 2000, Ricks registered the domain name "bme.com."[1]  (Id. & Pl.'s Mot. Summ. J.,

20  Ex. B.)  Ricks avers that he never has transferred the ownership of the domain name to any

21  other person or entity since that time.  (Ricks Decl. at 2.)

22    Although ownership of the domain name was not changed, Ricks repeatedly

23  changed the contact information and the Registrant, Administrative, Technical, and Billing

24

25  ─────────────────

26    [1]  Prior to Ricks owning the bme.com website, it was the website of a bicycle
organization.  (Def.'s Exs., Ex. A at 50-51.)

Contacts ("RATBC") for bme.com.  For example, in April 2000, Ricks changed the email address associated with the domain name, and changed the RATBC to motherboards.com, a sole proprietorship Ricks owned which he used to sell computer components.  (Id. at 3; Def.'s Exs., Ex. B at 34, 112.)  Ricks avers he decided to change the contact information available through the WHOIS[2] database because he did not want his personal contact information to be publicly available.  (Ricks Decl. at 3.)

In 2005, Ricks considered changing the registrar of his domain names to Moniker Online Services, Inc. ("Moniker").  (Id.)  Moniker offered privacy services to domain name owners which would permit third parties to maintain domain names without disclosing personal contact information, but Ricks decided against using Moniker's privacy services due to the cost.  (Id.)  Instead, Ricks incorporated a Wyoming corporation, Mighty Ventures, Inc., for which Ricks was the sole shareholder, to use as the point of contact. (Id.)  Ricks subsequently changed the corporation's name to Covanta Corporation ("Covanta"), and in March 2005, Ricks changed the RATBC for bme.com to Covanta.  (Id. at 3-4.)  In April 2005, Ricks changed the registrar for many of his domain names, including bme.com, to Moniker.  (Id.)

After changing to Moniker as the registrar, Ricks negotiated a privacy services deal with Moniker.  (Id.)  Ricks thus changed the RATBC for bme.com to Moniker Privacy Services in August 2005.  (Id.)  Ricks avers he subsequently discovered Moniker had technical problems associated with its privacy services, and he therefore decided to acquire Third Party Defendant Gee Whiz, which was a domain name registrar that also offered privacy services.[3]  (Id.)  In October 2007, Ricks changed the RATBC for bme.com to Gee

---

[2] WHOIS is a database maintained by domain name registrars which identify the person who owns particular domain names.  See Kremen v. Cohen, 325 F.3d 1035, 1049 n.12 (9th Cir. 2003).

[3] Ricks is the president and sole shareholder of Third Party Defendant Gee Whiz. (Third Party Def.'s Mot. Summ. J. (Doc. #56), Decl. of Gregory Ricks at 2.)

Whiz Domains Privacy Service.  (Id. at 4-5.)  Ricks changed the RATBC for bme.com one last time, in approximately June 2008, after Defendant initiated a domain name dispute with the World Intellectual Property Organization ("WIPO") in accordance with the Uniform Dispute Resolution Policy ("UDRP").  (Id. at 5; Def.'s Exs., Ex. C.)

Ricks permitted a "parking" company to provide the content for bme.com. (Def.'s Exs., Ex. B at 133.)  A parking company "puts up related ads to the domain name and they share the revenue they earn" with the domain name owner.  (Def.'s Exs., Ex. B at 121.)  A parking company can put up material on the website without the domain name owner's prior approval.  (Id. at 121-22.)  However, Ricks had some control over the content the parking company placed on his parked site.  (Id. at 136.)  For example, if he was contacted by a trademark holder regarding possible infringement, he could contact the parking company and make it change the content.  (Id.)

The bme.com website content changed over time.  In February 2003, it had links for items such as body jewelry and navel rings.  (Def.'s Opp'n to Pl.'s Mot. Summ. J. ("Def.'s Opp'n"), Ex. F (Doc. #86).)  In February 2005, it had links for subjects such as belly rings, body lights, body jewelry, pierced body jewelry, body piercing, and tongue rings.  (Def.'s Opp'n, Ex. G (Doc. #87).)  In April 2006, it had links for tattoo designs, body jewelry, body piercing, and body modification kits.  (Def.'s Opp'n, Ex. H (Doc. #88).)  In March 2007, it had links to wholesale body jewelry and tattoos.  (Def.'s Opp'n, Ex. I (Doc. #89).)  In July 2007, it had tattoo designs, body jewelry, body piercings, and a picture of girl with a tattoo.  (Def.'s Exs., Def.'s Special Ex. 1, Attach. X.)  In December 2007, the bme.com website contained similar types of links, including "Bme Tattoo" and body modification, and depicted a picture of a girl with a tattoo.  (Id.)  In February 2008, the site included links for body tattoo pictures, body lights, tattoo kits, airbrush tattoos, and pictures of tattoos.  (Id.)  It also included a section entitled "recent topics," which included body piercing jewelry and nipple rings.  (Id.)  On May 6, 2008, the bme.com landing page had a

picture of a man tattooing another individual, and had links to topics such as body lights, tattoo supply, tattoo pictures, body piercing, extreme genital piercing, and body modification.  (Id.)

**B.  Defendant BMEzine.com, LLC**

Defendant BMEzine.com, LLC ("LLC") is a Nevada limited liability company organized in January 2001.  (Pl.'s Mot. Partial Summ. J. (Doc. #55), Ex. C; Def.'s Exs., Ex. A at 15-16.)  The LLC owns and operates a website, bmezine.com, which provides an online community, articles, and photos related to body modification, such as tattooing and piercing.  (Def.'s Exs., Special Ex. 1, Attach. U.)  The LLC used "BME" as an acronym for BMEzine, which itself meant Body Modification Ezine.  (Pl.'s Mot. Partial Summ. J., Ex. E at 112-13, 152, Ex. F at 261.)  "BME" also was meant to signify "Be Me," a theme on being yourself and "reflecting on the outside who you are as a person."  (Pl.'s Mot. Partial Summ. J., Ex. F at 265.)  BMEzine's founder, Shannon Larratt, avers that he always considered BME to be more than an acronym for a generic term.  Rather, he used BME as a tradename for the business.  (Def.'s Opp'n, Ex. K.)

Prior to the LLC's organization, the BMEzine website was operated by Shannon Larratt.  (Def.'s Exs., Ex. A at 32.)  BMEzine launched as an online publication on USENET[4] in 1994, and since has operated under a variety of different web addresses, always using "bme" somewhere in the web address.  (Def.'s Exs., Ex. EE at 1; Pl.'s Opp'n to Mot. Summ. J., Ex. 2, Shannon Larratt Decl, Ex. A.)  Since that time, it has been referenced in various newspaper articles, including a July 1995 Los Angeles Times article on body modification and body art which referred to a "zine called BME ('Body

---

[4]  "USENET is an abbreviation of 'user network.'  This term refers to an international collection of organizations and individuals (known as 'peers') whose computers connect to one another and exchange messages posted by USENET users.  Ellison v. Robertson, 357 F.3d 1072, 1074 n.1 (9th Cir. 2004).

Modification Ezine'), which features beautiful graphics." (Pl.'s Mot. Partial Summ. J., Ex. G.)  In 1996, the Omaha World Herald ran a column which directed readers curious about body piercing to "Body Modification Ezine at http://www.io.org./~bme/ on the Net." (Id.)  In 1997, the Guardian in London listed various websites and their content, stating "BME is a Body Modification E-Zine (electronic magazine) devoted to decorative mutilation, piercing and tattoos.  If www.bme.freeq.com isn't shocking enough, the publishers are planning to post stronger stuff in a new section, BME/hard." (Id.)  In 1999, the Tampa Tribune ran an article on body modification, and mentioned "www.bme.freeq.com - Body Modification Ezine.  Has online photos of brands, testimonials and advice." (Id.)  That same year, the University of Pittsburgh's The Pitt News issued an article on body piercing, which referred readers interested in viewing pictures of body modifications to "http://www.bme.com."[5] (Id.)  According to Shannon Larratt, within months of BMEzine's launch, it was ranked as the twenty-fifth most popular site on the Internet, and was the world's largest repository of pictures on body modification. (Pl.'s Opp'n to Mot. Summ. J., Ex. 2, Shannon Larratt Decl., Ex. A.)

BMEzine has permitted users to subscribe to the site by submitting stories or photographs of themselves. (Def.'s Exs., Ex. EE at 2.)  The site has obtained hundreds of thousands of subscribers through submissions. (Id.)  The Body Modification Ezine website in 1997 included a link to "BMENews," solicited advertising "on BME," and set forth contact information as "BME: Body Modification Ezine." (Pl.'s Mot. Partial Summ. J., Ex. I.)  The site in 1997 included a copyright notice in favor of Shannon Larratt. (Id.)  The site in 1999 included other subgroups to which a browser could navigate, including "bme/extreme," "bme/hard," "bme/live" and "bme/store." (Pl.'s Mot. Partial Summ. J., Ex.

---

[5]  The Pitt News did not provide the LLC's correct website, as bme.com is the website in dispute in this action, which is owned by Plaintiff Ricks.

I.)  It also provided a link for browsers to "Contact BME."  (Id.)  The 1999 and 2000 web pages included a copyright notice in favor of "Shannon Larratt/BME."  (Id.)  BMEzine operates various websites with the "bme" prefix, such as bmevideo.com, bmehard.com, bmeworld.com, bmeink.com, among many others.  (Def.'s Opp'n to Mot. Summ. J., Ex. E, Decl. of Rachel Larratt.)  In 1997 or 1998, BMEzine added the website bmeshop.com, which sold t-shirts, jewelry, medical supplies, and videos.  (Pl.'s Opp'n to Mot. Summ. J. (Doc. #95), Ex. 2, Shannon Larratt Decl., Ex. A.)  The site continued to receive mention in various media articles which referred to the site as "BME," including articles from 2003 to 2007 in the Daily News, the Journal of Sociology, the Houston Chronicle, the Grand Rapid Press, and the Phoenix New Times.  (Def.'s Exs., Ex. T.)

In 2004, Shannon Larratt's wife, Rachel Larratt, became the LLC's sole shareholder and its chief executive officer.  (Def.'s Exs., Ex. A at 15, 37.)  The LLC's initial purpose was to be a third party service provider to BME, and "was never intended to and never had ownership of the websites or any of the other assets of the business."  (Def.'s Exs., Ex. A at 168, 200; Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 2, Shannon Larratt Decl.)  However, according to Rachel Larratt, that changed when she took over the LLC in 2004.  (Id. at 168.)  Previously, the website bmezine.com was registered to BME, PsyberCity or in Shannon Larratt's name, and prior to 2004, the BMEzine business was owned by Shannon Larratt and/or his company, PsyberCity.  (Def.'s Exs., Ex. A at 186, Ex. S at 262.)  However, after Rachel Larratt assumed control of the LLC, she recommended the registration for the bmezine.com website be changed to the LLC "because the LLC owned it."  (Def.'s Exs., Ex. A at 187.)

Shannon Larratt denies that Rachel Larratt or the LLC had any ownership interest in the BMEZine business or its related intellectual property as of 2004.  (Pl.'s Opp'n to Mot. Summ. J. (Doc. #95), Ex. 2, Shannon Larratt Decl.)  According to Shannon Larratt, he always operated BMEzine as a sole proprietorship and owned all property, including

intellectual property such as any trademark rights in BME and the BME logo.  (Pl.'s Opp'n to Mot. Summ. J., Ex. 2, Shannon Larratt Decl, Ex. A.)  Shannon Larratt previously licensed the rights to use the website bmeshop.com to a third party.  (Id.)  The Licensing Agreement identified the contracting party as "'BME (aka Shannon Larratt and Psybercity Inc.).'"  (Id.)  No documentation exists showing a transfer of the ownership of the BMEzine assets to the LLC in 2004.  (Def.'s Exs., Ex. S at 262.)

The Larratts subsequently separated in January 2006 and also commenced litigation to resolve whether the LCC or Shannon Larratt owned the rights to the BMEzine website and related intellectual property.  (Def.'s Exs., Ex. A at 38, 48-49.)  While the Larratts disputed ownership, a receiver was appointed.  (Id. at 86.)  The receiver transferred the domain names to itself, as ordered by the appointing court.  (Id. at 86-87.)  The transfer was not meant to effect a change in ownership, as the receiver was holding the domain names for the benefit of the owner, i.e., whoever ultimately prevailed in the litigation.  (Id.)

In March 2008, the LLC, under Rachel Larratt's signature, filed a trademark application with the U.S. Patent and Trademark Office ("PTO") for the mark "BME" with respect to "[p]roviding an online interactive database of photos and videos in the field of body art, namely, piercing, tattoos, scarification, subincision, castration."  (Def.'s Exs., Ex. A at 94, Ex. H.)  The application was filed during the time the receiver was in control of the disputed domain names and related intellectual property.  (Def.'s Exs., Ex. A at 101.)  Rachel Larratt testified she believed that the LLC had the right to the trademark.  (Id. at 116.)  According to Rachel Larratt, the parties already had reached a verbal settlement in February 2008, and were working on drafting formal settlement documents at the time she filed the trademark application on the LLC's behalf.  (Id. at 100-01.)

In May 2008, the Larratts entered into a formal written agreement pursuant to which the parties would settle their dispute over ownership of the BMEzine assets.  (Opp'n to Def.'s Mot. Summ. J. (Doc. #95), Ex. 3.)  Rachel Larratt agreed to pay Shannon Larratt a

sum of money in exchange for Shannon Larratt "releas[ing] to Rachel . . . all of his right, title and interest in the business known as BME (the BME business) and any and all of the assets of . . . the said business, including all trademarks, [and] domain names . . . ." (Id.; Def.'s Exs., Ex. A at 66-67, Ex. S.)  The transfer of ownership was to occur upon the transfer of the second installment of payment from Rachel Larratt to Shannon Larratt. (Opp'n to Def.'s Mot. Summ. J., Ex. 3.)  On September 15, 2008, the Larratts and the LCC entered into the final settlement agreement in which Shannon Larratt released all his right, title, and interest in the LLC, including all associated intellectual property.  (Def.'s Exs., Ex. A at 77-80, Def.'s Opp'n to Mot. Summ. J., Ex. 4.)

On September 10, 2008, the LLC added to its trademark application use of the mark in "[a]dvertising and directory services, namely, promoting the services of others by providing a web page featuring links to the websites of others."  (Def.'s Exs., Ex. G.)  That same date, the LLC also added a use for "[c]omputer services, namely, hosting online web facilities for others for organizing and conducting online meetings, gatherings, and interactive discussions; and computer services in the nature of customized web pages featuring user-defined information, personal profiles and information, all in the field of body art."  (Id., Ex. I.)

### C.  The Parties' Interactions

In 2004, Shannon Larratt contacted Ricks to see if Ricks wanted to sell bme.com. (Def.'s Exs., Ex. B at 127.)  Ricks responded that it was not for sale.  (Id.)  According to Shannon Larratt, he knew about the bme.com website since 1999.  (Pl.'s Opp'n to Mot. Summ. J., Ex. 3, Shannon Larratt Decl.)  However, Shannon Larratt did not consider bme.com to be infringing on BMEzine's rights, as it was only a search engine or provided links to other sites, and it never hosted an online photograph or video database, or provided news or other content related to body modification.  (Id.)  Shannon Larratt did not believe that members of the body modification community would believe bme.com was affiliated

with bmezine.com.  (Id.)  He therefore deliberately chose not to file legal action against bme.com, even though he pursued others he thought were infringing on BMEzine's intellectual property rights.  (Id.)

Ricks and BMEzine did not communicate again until November 2007, when Rachel Laratt observed the bme.com website.  (Def.'s Exs., Ex. A at 52.)  Rachel testified that she viewed bme.com in response to emails from customers who claimed they had attempted to contact customer support at BMEzine, but in fact had sent emails to support at bme.com.[6]  (Id. at 53.)  When Rachel Larratt viewed the bme.com website in November 2007, it contained images of body modifications, and contained script referencing "BME tattoo, BME piercing, Body Modification Ezine."  (Id. at 56.)

Rachel Larratt offered to purchase bme.com for $20,000 by communicating the offer to the email address provided in the WHOIS database.  (Id. at 131.)  Because Moniker was providing privacy services to Ricks at that time, Moniker received the email and advised Ricks that a buyer was interested in bme.com.  (Def.'s Exs., Ex. B at 130.)  Ricks ignored the initial request, and Ricks did not know from whom the original offer came. (Id.)  Moniker later advised Ricks it had an offer for $50,000 to $75,000.  (Id. at 134.) Ricks again ignored the request.  (Id. at 134-35.)  Moniker advised Rachel Larratt the website owner wanted $100,000.  (Def.'s Exs., Ex. S at 326.)  Rachel Larratt responded by asking if the owner would take $50,000 up front, with the rest paid out over time.  (Id.) Moniker responded the owner wanted $130,000.  (Id.)  Moniker then advised Rachel Larratt that the owner wanted $160,000.  (Id.)  Ricks contends he only found out later that the

///

////

---

[6]  In addition to the misdirected emails to customer service, online chat threads show that individuals who were discussing body art and giving ideas for tattoos confused bme.com with bmezine.com.  (Def.'s Exs., Exs. J, K, L, M, O, P, Q.)

offeror was Rachel Larratt from the LLC, and that she had offered as much as $100,000.[7] (Def.'s Exs., Ex. B at 135; Pl.'s Opp'n to Mot. Summ. J. on Counterclaims, Ex. 5.)  No evidence in the record suggests Ricks knew or approved of Moniker's increasing offers to sell bme.com for $100,000, $130,000, or $160,000.

On June 9, 2008, the LLC initiated a domain name dispute with WIPO in accordance with the UDRP.  (Def.'s Exs., Ex. A at 123, Ex. C.)  In support of its claim before WIPO, the LLC provided the declarations of four expert witnesses, Kevin Wimberly ("Wimberly"), Elayne Angel ("Angel"), David Vidra ("Vidra"), and Allen Falkner ("Falkner").  (Def.'s Exs., Exs. U, V, W, X.)  Wimberly averred that he started getting tattoos in 1998, and as a result knows artists, shop owners, and others interested in the subject.  (Def.'s Exs., Ex. W.)  Wimberly considers himself a tattoo enthusiast.  (Id.) Wimberly has used BMEzine for ideas for tattoos, and as inspiration for a paper he wrote during law school on copyright and tattoos.  (Id.)  According to Wimberly, the "entire tattooing, body piercing, and body art community refers to BMEzine, LLC and various other enterprises such as the BME Fest, BME Scholarship, BME News, etc., as simply 'BME.'"  (Id.)  Wimberly opines that if anyone else in the industry used "BME," it would be confusing.  (Id.)  For example, Wimberly avers he initially was confused when directed to the bme.com website, because he thought it was BMEzine-related until he discovered it was a parked site.  (Id.)

Likewise, Vidra, health and safety advisor to the Society of Permanent Cosmetics, averred that in the body modification market, BMEzine LLC is known as BME. (Def.'s Exs., Ex. V.)  According to Vidra, BMEzine was world famous in the field as early

---

[7]   Ricks does not recall the time frame when he first discovered the type of content on BMEzine.com, but he testified he received questions about piercings through bme.com, and that probably prompted him to look at the BMEzine website.  (Def.'s Exs., Ex. B at 135-36.)  Ricks had viewed bmezine.com prior to the LLC's UDRP complaint.  (Id. at 143.)

as 1994 or 1995.  (Id.)  To his knowledge, no other companies in the field use the letters "BME," and if they did so, it would be confusing.  (Id.)  Vidra averred that when he first viewed bme.com, he thought it was an addition to the BMEzine websites because it displayed links to tattooing, piercing, body lights, and body art, and it showed an image of a man tattooing another person.  (Id.)  Upon further inspection, he realized bme.com was not associated with BMEzine.  (Id.)

Angel asserts she is an expert in the field of body piercing and is registered as such with the Technical Advisory Service for Attorneys.  (Def.'s Exs., Ex. X.)  Angel is a regular contributor to Pain Magazine and is writing a forthcoming book in which she refers to bmezine.com as "BME," and directs readers to the website for an on-line community to discuss body modification with like-minded individuals.  (Id.)  According to Angel, the marketplace associates "BME" with BMEzine.  (Id.)  Angel has known about BMEzine since the mid 1990s and she avers the site was world famous by 1994 or 1995.  (Id.)  Angel contends no other similar companies could use "BME" without causing confusion.  (Id.)  As with Wimberly and Vidra, Angel avers she visited bme.com and at first thought it was an addition to the BMEzine websites.  (Id.)

Finally, Falkner avers that he is a founding member of the Association of Professional Piercers, owns a tattoo removal company, and owns a website on body suspension, which is "the art of suspending one[']s body from fixed objects by placing piercing through the flesh and skin."  (Def.'s Exs., Ex. U.)  Falkner states he is familiar with the marketplace which knows and refers to BMEzine as "BME."  (Id.)  According to Falkner, BMEzine was world famous by 1994 or 1995.  (Id.)  When Falkner visited the bme.com website, he immediately knew it was not part of BMEzine.  (Id.)  Based on this and other evidence, the arbitration panel issued a decision in the LLC's favor, and in

///

///

August 2008 ordered the bme.com domain name transferred from Ricks to the LLC.[8] (Def.'s Exs., Ex. E.)

On September 5, 2008, Ricks filed a Complaint in this Court.  (Compl. (Doc. #1).)  Ricks asserts claims for reverse domain name hijacking under 15 U.S.C. § 1114(2)(D)(v), fraud in a domain name dispute proceeding under 15 U.S.C. § 1114(2)(D)(iv), false or fraudulent registration under 15 U.S.C. § 1120, cancellation of trademark registration under 15 U.S.C. § 1064(3), and declaratory relief of non-infringement.  (Am. Compl. (Doc. #27).)  Defendant LLC answered and filed counterclaims for cybersquatting under 15 U.S.C. § 1125(d), trademark infringement under 15 U.S.C. § 1125(a), willful trademark infringement under 15 U.S.C. § 1114(1), false designation of origin under 15 U.S.C. § 1125(a), unfair competition, Nevada common law trademark infringement, deceptive trade practices under Nevada Revised Statutes § 598.0915, intentional interference with prospective economic advantage, trademark infringement under Florida Statutes § 495.131, dilution under Florida Statutes § 495.151, and declaratory judgment.

The parties now cross move for summary judgment on the various claims and counterclaims.  Plaintiff Ricks also moves to strike certain declarations provided in support of Defendant's filings.

## II.  LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing

---

[8] The WIPO panel's decision is not entitled to deference on the merits.  See Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona, 330 F.3d 617, 623 (4th Cir. 2003); Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 27 (1st Cir. 2001).

substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

## III.  RICKS' MOTION TO STRIKE (Doc. #67)

Ricks moves to strike the declarations of Lawrence Walters ("Walters"), Defendant's prior counsel in this case, and Vidra as undisclosed witnesses.  Ricks also moves to strike the declarations of Angel, Wimberly, and Falkner for failure to comply with the requirements regarding the disclosure of experts and their reports.

The LLC responds by admitting it did not identify Walters as a witness, but contends it was not necessary to do so, as it was reasonably foreseeable Walters would be a witness with respect to Ricks' fraud allegations.  The LLC also argues Ricks could have moved for a continuance under Federal Rule of Civil Procedure 56(f) if he was surprised by Walters' addition as a witness.  As to the Angel, Vidra, Wimberly, and Falkner declarations, the LLC argues these witnesses were disclosed, and the expert reports were attached to its Answer.  The LLC contends any failure to comply with Federal Rule of Civil Procedure 26 with regard to these witnesses was harmless, as it provided the same information in the WIPO hearing.  The LLC also argues Angel, Falkner, Vidra, and Wimberly are not testifying as experts in this proceeding.  Finally, the LLC argues the record from the WIPO proceeding is admissible, as Ricks alleges fraud in the WIPO proceeding.

Federal Rule of Civil Procedure 26(a)(2)(B) requires the parties to disclose the identity of each expert witness along with the expert's written report.  The report must

include all of the witness's opinions and the bases therefore, the data the witness considered in forming those opinions, any exhibits that will be used in support, the witness's qualifications including all publications authored in the previous ten years, a list of all other cases during which the witness testified as an expert in the prior four years, and the amount of compensation paid to the expert.  Rule 37(c)(1) prohibits the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.  Wong v. Regents of Univ. of Cal., 410 F.3d 1052, 1062 (9th Cir. 2005).  The non-disclosing party may escape Rule 37(c)'s sanction if the failure to disclose was substantially justified or was harmless.  Fed. R. Civ. P. 37(c)(1).  No evidence of bad faith on the part of the non-disclosing party is required to exclude expert testimony under Rule 37(c)(1).  Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001).  The party facing sanctions bears the burden of proving harmlessness.  Id. at 1107.

Defendant LLC's initial disclosures identified as potential witnesses in the case Ricks, the Larratts, Angel, Wimberly, and Falkner.  (Def.'s Exs., Ex. T.)  The initial disclosures identified Angel, Wimberly, and Falkner as witnesses who were "expected to provide expert witness testimony," and provided their declarations, in which each witness identified himself or herself as an expert.  (Def.'s Opp'n to Mot. to Strike, Ex. E.)  Although not identified as a witness in the initial disclosures, Defendant LLC provided Vidra's declaration as part of its initial disclosures.  (Id.)  Defendant LLC never identified Walters as a potential witness until the LLC filed his declaration in support of its filings at the summary judgment stage.

The Court will strike witness Walters.  Defendant LLC offers no justification for its failure to identify Walters as a witness, and instead argues Plaintiff should have anticipated Walters would be a witness.  That a party may anticipate a particular individual may be a witness does not excuse noncompliance with the Rules.  Moreover, it is unclear how Plaintiff should have anticipated Defendant LLC's prior counsel in this action would

be a witness in this same action.  A party's counsel is not usually a witness for that party in the same action.  Discovery has closed, and Plaintiff Ricks therefore is prejudiced in his ability to conduct discovery in relation to Walters' statement.

As to the other declarations, the LLC provided the declarations of Angel, Wimberly, Falkner, and Vidra in the WIPO proceeding and as part of Defendant LLC's initial disclosures.  None of the declarations set forth the data the witnesses considered in forming their opinions, any exhibits that will be used in support, all publications the witnesses authored in the previous ten years, a list of all other cases in which the witnesses testified as an expert in the prior four years, or the amount of compensation paid to the experts.  Defendant LLC did not comply with Rule 26 and that failure was not substantially justified.  Defendant LLC described its witnesses as experts, but did not comply with Rule 26's requirements, either initially or through supplemental disclosures.

However, that failure is harmless in this case.  Plaintiff Ricks has been aware of these witnesses and the substance of their declarations since before he filed his Complaint in this case.  Indeed, Plaintiff produced the declarations as part of his own initial disclosures.  The witnesses set forth the basis for their asserted expertise in the relevant area, opined on the status of BME as being associated with BMEzine in the relevant community, and opined on whether bme.com would cause confusion in the relevant community.  Plaintiff thus has known about the critical aspects of these witnesses' testimony from the inception of this case and could have deposed these witnesses during discovery in this case to explore any deficiencies in Defendant LLC's disclosures.  Given the nature of their alleged expertise, the lack of compliance with Rule 26 is not as prejudicial as would be the case where the expert was giving more technical or scientific opinions.  While the Court is reluctant to excuse Defendant LLC's failure to comply with Rule 26, the preference for deciding matters on the merits, rather than on procedural missteps, counsels in favor of exercising the Court's discretion to admit the expert witness

declarations.

The Court therefore will grant Plaintiff Ricks' motion to strike Walters' declaration.  The Court will deny the motion to strike the declarations of Angel, Wimberly, Falkner, and Vidra.

**IV.  RICKS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #55)**

Ricks moves for partial summary judgment, arguing that the mark "BME" is generic as an acronym for "body modification ezine," and therefore is not protectable as a trademark.  Ricks also argues he registered the bme.com website on March 6, 2000, and continuously has owned it ever since, regardless of his use of domain name privacy services.  Ricks contends that the only registration date that therefore is important for the LLC's counterclaim for cybersquatting is the original registration date, March 2000.  Ricks contends that at the time he registered bme.com, the "BME" mark was not famous or distinctive, Defendant did not use it as a source identifier, and it had not acquired a secondary meaning by the time Ricks had registered the domain name.  Ricks therefore moves for summary judgment on Defendant's first counterclaim for cybersquatting.

Defendant responds that the "BME" mark is not generic, and Ricks cannot overcome the presumption of protectability to which the mark is entitled due to its registration.  Defendant contends it has presented evidence the mark does not refer to a class of goods, but in fact is a source identifier for the LLC.  As to the registration date, Defendant argues that the Anticybersquatting Consumer Protection Act ("ACPA") does not limit liability to only the creation registration, and that each registration or re-registration, even if by the same owner, may subject the registrant to liability under the Act.  Defendant thus argues that even if Ricks ultimately was the owner since 2000, his purported innocent registration at the very first registration does not insulate him from all future infringing behavior.  Finally, Defendant argues that even if March 6, 2000 is the relevant date, Defendant had established common law rights in the BME mark prior to that date.

## A. Genericness

To state an anticybersquatting claim, the plaintiff must establish that its mark upon which the domain name allegedly infringes was "distinctive at the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A)(ii)(I); Lahoti, 586 F.3d at 1197. Marks generally are classified in one of five categories: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Suggestive, arbitrary, and fanciful marks are inherently distinctive and thereby automatically are entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product." Id. A descriptive mark is not automatically entitled to trademark protection, but may become protectable if the mark has acquired distinctiveness through secondary meaning. Zobmondo Entmt., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C. § 1052(f)). Generic marks are not eligible for trademark protection, even if they acquire secondary meaning. Id.; Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007); Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1147 (9th Cir. 1999).

A mark is generic if it "primarily denotes a product, not the product's producer." Anti-Monopoly, Inc. v. Gen. Mills Fun Group, 611 F.2d 296, 301 (9th Cir. 1979). Generic marks are not subject to trademark protection because it would grant one competitor a monopoly over the language which his competitors may use to fairly describe their own products. Id.

Generic marks have been described as marks which "refe[r] to the genus of which the particular product is a species." Two Pesos, Inc., 505 U.S. at 768 (quotation omitted). To determine whether a mark is generic, the Court analyzes "whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 929 (9th Cir. 2005). "If buyers understand

18

the term as being identified with a particular producer's goods or services, it is not generic. But if the word is identified with all such goods or services, regardless of their suppliers, it is generic." Id. (quotations and internal citation omitted).  Courts have framed this as the "who-are-you/what-are-you" test. Id.  "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?'  But the generic name of the product answers the question 'What are you?'" Id. (quotation omitted).

A mark that consists of an abbreviation for generic words itself may be generic, but it may be protectable if the abbreviation "has a meaning distinct from the underlying words in the mind of the public." Welding Servs., Inc., 509 F.3d at 1359; Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc., 692 F.2d 478, 488 (7th Cir. 1982).  The Court thus must view the mark as a whole, rather than examining its individual component parts. Filipino Yellow Pages, Inc., 198 F.3d at 1149-50.

Additionally, "[c]ontext is critical to a distinctiveness analysis." Lahoti, 586 F.3d at 1201.  The Court evaluates the mark "as if it were seen on the goods or services" within the relevant industry context because a term is not generic in and of itself, but only in the term's use in relation to the product or service at issue. Id.; Welding Servs., Inc., 509 F.3d at 1358.  For example, the word ivory is generic in reference to an elephant tusk, but is arbitrary as applied to a product such as soap. Welding Servs., Inc., 509 F.3d at 1358. Further, the Court makes this inquiry from the perception of the purchasing public. Zobmondo, 602 F.3d at 1113.  Ultimately, the Court inquires whether consumers who ask for the product by the mark are describing the type of product, or are seeking the product of a particular producer. Anti-Monopoly, Inc., 611 F.2d at 303-05.

Evidence that numerous other companies in the industry actually answer the question "what are you" by using the terms in the mark suggests the mark is generic. Closed Loop Mktg., Inc. v. Closed Loop Mktg., LLC, 589 F. Supp. 2d 1211, 1219 (E.D. Cal. 2008) (holding evidence that six other companies could identify themselves as closed loop

marketing companies was evidence that term "closed loop marketing" was generic).

Additionally, the mark holder's use of words in the mark to describe its and its competitors'

services is evidence that the mark is generic.  Welding Servs., Inc., 509 F.3d at 1359.

The question of which classification applies to a particular mark is a factual

determination.  Lahoti, 586 F.3d at 1195.  The mark holder "bears the ultimate burden of

proof in a trademark-infringement action that the trademark is valid and protectable."

Zobmondo, 602 F.3d at 1113.  However, federal registration of the mark constitutes "'prima

facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that

the mark is a protectable mark," and that it is not generic.  Id. (quoting 15 U.S.C.

§§ 1057(b), 1115(a); KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d

596, 604 (9th Cir. 2005)); see also Lahoti, 586 F.3d at 1199; Coca-Cola Co. v. Overland,

Inc., 692 F.2d 1250, 1254 (9th Cir. 1982).  If the mark has been properly registered, the

burden shifts to the alleged infringer to show by a preponderance of the evidence that the

mark is not protectable.  Zobmondo, 602 F.3d at 1114.  The alleged infringer may meet this

burden by demonstrating "through law, undisputed facts, or a combination thereof that the

mark is invalid."  Id. (quotation omitted).  However, the presumption of validity for a

registered mark is strong, and the alleged infringer bears a heavy burden to overcome it at

the summary judgment stage.  Id.

Here, the LLC has obtained a registered mark from the PTO for "BME" in

relation to providing an online interactive database of photos and videos in the field of body

modification, and advertising and directory services to provide links to others' websites.

The burden thus shifts to Plaintiff Ricks to overcome the presumption of validity and

protectability the registration provides, including the presumption that the mark is not

generic.  Ricks has not done so.

Ricks has presented no evidence that consumers seeking out "BME" do so as an

abbreviation for body modification ezines as a class of products, rather than as a source

identifier for the LLC.  Rather, Ricks relies entirely on the argument that BME is an abbreviation for Body Modification Ezine, and those words generically describe a class of products.  It is doubtful that Ricks' pure legal argument could meet his heavy burden of overcoming the presumption of validity due to the registration of the BME mark.  But even if it could, Ricks has presented no evidence that a class of products known as body modification ezines even exists.  Ricks has not identified a single other entity which identifies itself as a body modification ezine.  The fact that no other competitor would answer the question "what are you" by describing itself as a body modification ezine, much less as "BME," weighs against a finding of genericness.

Moreover, the LLC has presented evidence that the relevant community within the purchasing public recognizes the abbreviation "BME" as a source identifier for the LLC, and not with body modification ezines generally.  Vidra, Angel, Wimberly, and Falkner all aver in their declarations that the tattooing, piercing, and body modification community refers to the LLC's business as "BME" and has done so for many years.  Further, the chat threads and newspaper articles all refer to the LLC as "BME," and do not use the term generically to discuss body modification ezines generally.  In fact, none of the articles discuss or use the term "body modification ezine" or its abbreviation "BME" generically.[9]

The LLC also has presented evidence from the founder of the BMEzine business, Shannon Larratt, that the "BME" mark signifies more than just an abbreviation for "BMEzine."  Rather, the abbreviation also stands for "Be Me," a theme which was explored on the website through self expression and articles on a person's outside reflecting who they

---

[9] One article uses BME as an acronym for "Body Modification Enthusiasts."  (Def.'s Special Ex. 1, Ex. G.)  That single article does not establish that BME stands for "body modification ezines" generally, and in fact uses the acronym for something other than a class of goods known as body modification ezines.

are on the inside.  The LLC thus has presented evidence that BME is more than just a generic abbreviation for a generic phrase, but has a meaning distinct from those words.

In sum, considering the strong presumption in favor of finding the LLC's mark is valid and protectable, and viewing all facts and reasonable inferences therefrom in the light most favorable to the LLC as the nonmoving party, genuine issues of material fact remain that the "BME" mark is not generic.  The Court therefore will deny Ricks' motion for summary judgment on this issue.

**B.  Registration Date**

The Court's aim in conducting statutory construction is to discern congressional intent in enacting a particular statute.  Cooper v. F.A.A., 596 F.3d 538, 544 (9th Cir. 2010). The Court begins the statute's plain language.  Id.  If the statutory language is "plain and unambiguous," the Court's inquiry is at an end.  Id.  "To discern the text's plain meaning, words will be interpreted as taking their ordinary, contemporary, common meaning."  Id. (quotation omitted).

Pursuant to the ACPA, a person "shall be liable in a civil action by the owner of a mark" if that person "registers, traffics in, or uses a domain name" with the bad faith intent to profit from a famous or distinctive mark.  15 U.S.C. § 1125(d)(1)(A).  The statute does not refer to an original registration or the registration that creates the domain name.  See So. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1239, 1245-46 (11th Cir. 2009) (considering defendant's possible liability for re-registering domain name but finding no bad faith intent to profit off the mark); Schmidheiny v. Weber, 319 F.3d 581, 582 (3d Cir. 2003) (holding that ACPA section prohibiting registration of a living person's name without the person's consent and with the intent to profit was not limited to the domain name's "'creation date'" because "the plain meaning of the word 'registration' is not limited to 'creation registration.'").  The Act provides no exception for re-registrations by the same owner.  Any registration thus may bring the registrant within the statute's purview.

Congressional intent would be undermined by Ricks' proposed interpretation.  If a domain name was registered in good faith originally, but thereafter re-registered in bad faith, the cybersquatter would escape liability, a result not supportable by the statutory scheme.  See Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1202 (9th Cir. 2009) ("Evidence of bad faith may arise well after registration of the domain name."); Schmidheiny, 319 F.3d at 583 ("To conclude otherwise would permit the domain names of living persons to be sold and purchased without the living persons' consent, ad infinitum, so long as the name was first registered before the effective date of the Act.  We do not believe that this is the correct construction of the Anti-cybersquatting Act."); Storey v. Cello Holdings, LLC, 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration.").  The Court therefore will deny Ricks' motion for summary judgment to the extent it seeks a declaration that the original registration date is the only relevant registration date in this action.

Ricks, either himself or through intermediaries, registered the bme.com website in March and April 2005, October 2007, and June 2008.  Consequently, if the LLC's "BME" mark was distinctive or famous before any of these dates, Ricks would not be entitled to summary judgment on the LLC's counterclaim for cybersquatting.

All of these dates pre-date the registration of the LLC's "BME" mark with the PTO.  However, the LLC has presented evidence raising a genuine issue of material fact that the LLC or its predecessors[10] owned common law rights to a distinctive mark in "BME" prior to March 2000, March and April 2005, October 2007, and June 2008.  The

_____

[10]   Ricks concedes, for purposes of this motion, that viewing the facts in the light most favorable to LLC, it or its predecessors owned any intellectual property rights associated with the BMezine business, to the extent any such intellectual property rights existed.  (Pl.'s Mot. Summ. J. (Doc. #55) at 7.)

LLC has presented evidence that BMEzine has been on the internet in one form or another since 1994, and that it quickly thereafter gained fame in the relevant community. The LLC also has presented evidence that those within the community knew of and referred to the BMEzine as "BME," and did so as a source identifier, not merely as an abbreviation for body modification ezines generally. In addition to the relevant body modification community, mainstream print sources referenced readers to the BMEzine website, and referred to the business as "BME" prior to and after March 2000. None of those articles referenced body modification ezines generally or used BME as an abbreviation for body modification ezines as a class of products.

The LLC also has presented evidence that BMEzine used "BME" as a source identifying mark. As discussed previously, BMEzine's founder, Shannon Larratt, described his use of the BME mark as more than just an abbreviation for "Body Modification Ezine." The BMEzine family of websites used BME in the website addresses themselves, in the text of various website content, and as descriptors for segments of the BMEzine websites (i.e., "bme/hard"). Moreover, the LLC has presented evidence that the BME mark was viewed as sufficiently valuable intellectual property to be the subject of a license agreement in relation to the bmeshop website. Viewing the facts in the light most favorable to the LLC, a genuine issue of fact remains as to whether the LLC owned protectable rights in a distinctive mark consisting of the letters "BME" in relation to online body modification-related content as of March 2000 and later. The Court therefore will deny Plaintiff's motion for summary judgment on Defendant LLC's counterclaim for cybersquatting.

**V. GEE WHIZ'S MOTION FOR SUMMARY JUDGMENT (Doc. #56)**

Third Party Defendant Gee Whiz moves for summary judgment, arguing it never has owned, registered, or used the domain name bme.com, it simply acted as a domain name privacy service for Ricks. Defendant responds that Gee Whiz registered, trafficked in, or used bme.com because it was the registrant of the domain name, and courts have held that

1   entities providing privacy services may be liable for cybersquatting.  Alternatively,

2   Defendant argues Gee Whiz is Ricks' alter ego.

3           The Court will deny Gee Whiz's motion.  As discussed in relation to Plaintiff

4   Ricks' motion for summary judgment, the Act predicates liability on registration, use, and

5   trafficking.  That another person may have owned the domain name does not relieve Gee

6   Whiz of its own liability for its acts in registering, trafficking in, or using the domain name.

7   The LLC has presented evidence that as of May 9, 2008, Gee Whiz was identified as the

8   registrant of the bme.com website.  (Def.'s Opp'n (Doc. #68), Ex. F.)  Gee Whiz therefore

9   may be liable if it registered the domain name in bad faith, even if Ricks was the actual

10  owner of the domain name.  The Court will deny Third Party Defendant Gee Whiz's motion

11  for summary judgment.

12  **VI.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ITS
    COUNTERCLAIMS (Doc. #57/Doc. #61)**

13          Defendant moves for summary judgment on its counterclaims for cybersquatting

14  and trademark infringement and dilution.  Defendant argues it owns the "BME" trademark,

15  and that mark has acquired distinctiveness in the relevant market.  Defendant further argues

16  Ricks has demonstrated bad faith intent to profit from the BME mark, as he has been on

17  notice of potential infringement since at least 2004, he escalated his use of the mark to

18  include links to tattoo and piercing websites, he tried to sell the domain name at an

19  exorbitant price, and he is a serial cybersquatter.  Defendant contends there is a likelihood

20  of confusion, as the marks are similar, offer related content, and use the same marketing

21  channels.  Defendant also argues there is evidence of actual confusion in the record.

22  Finally, Defendant asserts there is no basis for safe harbor protection for Ricks.

23          Ricks and Gee Whiz respond by arguing the significance of various other exhibits

24  or statements in Defendant's motion, including Defendant's efforts to paint Ricks as a serial

25  cybersquatter.  On the merits of the cybersquatting and trademark infringement claims,

26  Ricks and Gee Whiz argue Defendant did not own the rights to the Body Modification

25

Ezine marks at the time Ricks and/or Gee Whiz registered bme.com or at any time during an alleged infringing use.  Ricks and Gee Whiz also contend issues of fact remain as to whether Ricks acted in bad faith, whether Defendant used "BME" as a source identifier, and whether BME acquired distinctiveness as source identifier for Defendant.  Finally, Ricks and Gee Whiz argue that issues of fact remain as to likelihood of confusion.  In reply, Defendant objects to the declaration of Shannon Larratt as unsworn.

### A.  Shannon Larratt's Declaration

Defendant LLC objects to the use of Shannon Larratt's Declaration, attached as exhibit 2 to Plaintiff Ricks' opposition.  Defendant LLC contends the declaration was not made under penalty of perjury, and therefore cannot support Ricks' opposition.

Shannon Larratt's declaration states that he "declare[s] under penalty of perjury, as follows . . . . ."  (Pl.'s Opp'n to Def.'s Mot. Summ. J. (Doc. #95), Ex. 2.)  Shannon Larratt's declaration does not indicate where it was executed, but he states that he is a resident of Ontario, Canada.  (Id.)  In paragraph 3, Shannon Larratt states that the "statements herein are truthful."  (Id.)  In paragraph 13, of this declaration, Shannon Larratt avers that attached to the declaration as Exhibit A is "a true and correct copy of the Responding Affidavit of Shannon Larratt dated October 25, 2007, including all exhibits, filed in the Ontario Superior Court of Justice as part of the litigation Bmezine.com LLC and Rachel Larratt v. Shannon Larratt, Court File NO. 07-CL-721, and all of the facts and statements stated therein are truthful."  (Id.)  Attached to Shannon Larratt's declaration as Exhibit A is a sworn affidavit filed by Shannon Larratt in Ontario Superior Court of Justice. (Id., Attach. A.)  The affidavit states that it is made under oath, and was sworn before the Commissioner for Taking Affidavits in Toronto, Canada.  (Id.)

Pursuant to 28 U.S.C. § 1746, if a matter is required or permitted to be supported by a sworn declaration in writing, the requirement may be met by providing an unsworn declaration so long as the declaration is signed by the maker as true under penalty of

1    perjury, and dated, in "substantially" the form set forth in the statute.  If the declaration is

2    executed outside the United States, the suggested language is as follows:

3            I declare (or certify, verify, or state) under penalty of perjury under the
         laws of the United States of America that the foregoing is true and
4            correct. Executed on (date).
         (Signature).

5

6    28 U.S.C. § 1746(1).  If the declaration is executed within the United States, the following

7    language is suggested:

8            I declare (or certify, verify, or state) under penalty of perjury that the
         foregoing is true and correct. Executed on (date).
9            (Signature).

10   Id. § 1746(2).  The purpose of the oath or affirmation is to ensure the declarant understands

11   "the legal significance of the declarant's statements and the potential for punishment if the

12   declarant lies."  U.S. v. Bueno-Vargas, 383 F.3d 1104, 1111 (9th Cir. 2004).

13           Exhibit A to Shannon Larratt's declaration is Shannon Larratt's sworn affidavit.

14   Because that affidavit was sworn, the Court will deny the LLC's objection.  However,

15   Shannon Larratt's declaration is not sworn, and does not substantially comply with § 1746.

16   Shannon Larratt states that he is making the declaration under penalty of perjury, and he

17   states that all statements therein are true.  However, Shannon Larratt does not indicate he is

18   subject to the penalties of perjury in the United States.  Because he avers he is a Canadian

19   citizen, and the declaration does not indicate where it was executed, the Court cannot be

20   certain that the declaration meets § 1746's requirements.

21           The Court nevertheless will not strike the declaration, as its admission is

22   harmless. The critical facts which Shannon Larratt recites in the declaration regarding his

23   alleged ownership rights in the BMEzine intellectual property are repeated in the sworn

24   affidavit attached thereto.  Thus, the declaration does not add any significant facts not

25   already set forth in the sworn affidavit.  The Court therefore will consider the Shannon

26   Larratt sworn affidavit and unsworn declaration.

**B.  Ownership**

To establish claims for cybersquatting under the ACPA and trademark infringement or dilution under the Lanham Act, the LLC "must demonstrate that it owns a valid mark." Lahoti, 586 F.3d at 1196-97.  A registration of a mark is prima facie evidence of the owner's ownership of the mark.  15 U.S.C. § 1057(b).  However, a trademark owner generally cannot sue for and recover damages for infringement that occurred prior to the owner acquiring the mark.  H & J Foods, Inc. v. Reeder, 477 F.2d 1053, 1056 (9th Cir. 1973); George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536, 541 (2d Cir. 1944). Where a mark owner acquires its rights in the mark through assignment, it acquires no right to sue for pre-assignment infringements unless its right to do so is expressly set forth in the assignment agreement, or if the parties' contract provides for the acquisition of all the assets of the former trademark holder.  H & J Foods, Inc., 477 F.2d at 1056; George W. Luft Co., 142 F.2d at 541-42; Lanard Toys Ltd. v. Novelty Inc., 511 F. Supp. 2d 1020, 1030 (C.D. Cal. 2007).

The LLC does not dispute that it had to own the marks at the time of the alleged infringement to bring its claims.  Instead, it argues there is no issue of fact that it always has owned the BME marks.  The LLC attempts to portray the dispute between the Larratts as a dispute over ownership of the LLC itself, rather than over the intellectual property.  The LLC thus contends it always owned the intellectual property, and a dispute between the Larratts over who owned the LLC would not change the fact that the LLC owned the marks.

The evidence presented demonstrates that the dispute between the Larratts was not over who owned the LLC.  Rather, their dispute was over whether the BME business and its related intellectual property was owned by the LLC or by Shannon Larratt individually, as a sole proprietor.  Shannon Larratt never owned shares in the LLC, and never claimed to do so.  Shannon Larratt contended that he owned the BMEzine business and its related intellectual property, including the BME trademark, individually and that the

LLC never owned that property until the parties settled their dispute and he assigned his rights in BME to the LLC in September 2008. The LLC has presented no evidence demonstrating any infringing activity after the assignment in September 2008. A genuine issue of material fact therefore remains as to whether the LLC, as opposed to Shannon Larratt, owned the BME business and related intellectual property rights at the time of the alleged infringing activity.

The LLC makes no argument that the September 2008 assignment of whatever rights Shannon Larratt had in the BME business and related intellectual property constituted either an express assignment of the right to sue for past infringement, or a sale of all of Shannon Larratt's assets to the LLC, which necessarily would include the right to sue for past infringements. The Court therefore will not consider the issue.

Genuine issues of material fact remain as to whether the LLC owned the BME mark at the time of any alleged infringement by Ricks in this action. The Court therefore will deny the LLC's motion for summary judgment on its ACPA and trademark infringement and dilution counterclaims.

**VII. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. #59/Doc. #62)**

Defendant moves for summary judgment on Ricks' claims asserted in the First Amended Complaint. As to the reverse cybersquatting claim, Defendant argues Ricks will be unable to establish legal use of the bme.com domain name. As to the second claim for relief, Defendant contends it has the rights to trademark protection in the BME mark, either through its registration or through the Lanham Act, and thus made no misrepresentation regarding the domain name or its similarity to Defendant's mark. Defendant also argues that even if Ricks could prevail on this claim, the relevant statute provides only for injunctive relief, not damages. As to those claims asserting fraud, Defendants argue Ricks lacks standing to challenge the registration, the statement that Defendant owned the rights to its own marks was not fraudulent, Ricks has not been damaged, and Ricks ought to be

sanctioned under Rule 11 for maintaining these claims.  Defendant also requests attorney's fees under 15 U.S.C. § 1117(a).

Ricks responds by arguing some of the evidence on which Defendant relies is inadmissible.  Ricks also argues Defendant did not acquire the rights associated with "BME" until after the alleged infringement.  As to the reverse cybersquatting claim specifically, Ricks argues he must show only that his actions were not illegal under the ACPA, not the entire Lanham Act.  Ricks further argues he need show only that his registration or use was not unlawful, not both.  As to the misrepresentation claims, Ricks argues Defendant misrepresented its ownership in the alleged marks, and that suffices to state a claim under the ACPA.  Ricks claims he has standing to challenge the validity of Defendant's trademark registrations, as his use of bme.com is affected thereby.  Ricks argues Rule 11 sanctions are inappropriate, as Defendant has not complied with Rule 11. Finally, Ricks contends attorney's fees under § 1117(a) are not warranted.

## A.  Reverse Hijacking

Although the ACPA principally was aimed at prohibiting cybersquatting, the Act also provides some protection to domain name registrants against "overreaching trademark owners" who "reverse hijack" a domain name from a registrant where the registrant's actions were lawful.  Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona, 330 F.3d 617, 625 & n.1 (4th Cir. 2003) (quotations omitted).  Pursuant to 15 U.S.C. § 1114(2)(D)(v),

> A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter.  The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

To prevail on a reverse hijacking claim, the domain name registrant must show "(1) that it is a domain name registrant; (2) that its domain name was suspended, disabled, or transferred

under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II); and (3) that the owner of the mark that prompted the domain name to be suspended, disabled, or transferred has notice of the action by service or otherwise."[11]  Barcelona.com, Inc., 330 F.3d at 626.  Additionally, the registrant must show that its registration or use of the domain name is not unlawful under "this chapter."  15 U.S.C. § 1114(2)(D)(v).

Although as codified the ACPA states the registrant must show its actions were not unlawful under "this chapter," the actual enactment states that the registrant must show its actions were not unlawful under "this Act."  Pub. L. No. 106-113, 1501A-555, 113 Stat. 21.  Courts have differed in describing whether the fourth requirement's reference to "Act" as originally enacted refers to the ACPA or the Lanham Act as a whole.  See Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 382 n.9 (2d Cir. 2003) (noting issue but declining to decide it); Barcelona.com, Inc., 330 F.3d at 628 n.2 (stating, in dicta in a footnote, that "Act" is "defined to refer to the Trademark Act of 1946 (the Lanham Act)"); Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 18 (1st Cir. 2001) (describing, without analysis, a reverse hijacking claim as one "for a declaration of nonviolation of the ACPA").

As stated above, statutory construction begins the statute's plain language. Cooper, 596 F.3d at 544.  If the statutory language is "plain and unambiguous," the Court's inquiry is at an end.  Id.  The Court considers the statutory language in "the context of the statute as a whole."  Andreiu v. Ashcroft, 253 F.3d 477, 480 (9th Cir. 2001).

The ACPA as enacted does not define what it means by reference to the term "Act."  However, it defines what it means when it is referring to the Lanham Act as a whole:

> Any reference in this title to the Trademark Act of 1946 shall be a reference to the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes", approved

---

[11]  The parties do not dispute that Plaintiff Ricks will be able to establish these three elements.

July 5, 1946 (15 U.S.C. 1051 et seq.).

Pub. L. No. 106-113, 113 Stat. 1501, 1501A-548.  The ACPA thus indicates that it is not referring to the entire Lanham Act unless it references the Trademark Act of 1946. Contextually, the ACPA uses the term "Act" to refer to the ACPA, not the Lanham Act in its entirety.  For example, it states that it "shall apply to domain names registered on or after the date of the enactment of this Act."  Id.; see also Pub. L. No. 106-113, 113 Stat 1501, 1501A-550 (giving Secretary of Commerce 180 days after enactment of "this Act" to conduct a study).  Indeed, the ACPA refers to the "Act" and the "Trademark Act of 1946" within the same section, confirming that in using the term "Act," the ACPA is referring to itself, not the Lanham Act as a whole:

> Sections 3002(a), 3003, 3004, 3005, and 3008 of this title shall apply to all domain names registered before, on, or after the date of the enactment of this Act, except that damages under subsection (a) or (d) of section 35 of the Trademark Act of 1946 (15 U.S.C. 1117), as amended by section 3003 of this title, shall not be available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act.

Pub. L. No. 106-113, 113 Stat. 1501, 1501A-552.  The Court therefore concludes that to satisfy the ACPA's requirement that a domain name registrant show that its conduct was not unlawful under "this Act," it must show its conduct was not unlawful under only the ACPA, not the entire Lanham Act.

A person engages in unlawful conduct under the ACPA if he (1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive mark, or is identical, confusingly similar to, or dilutive of a famous mark, (3) with a bad faith intent to profit from that mark.  15 U.S.C. § 1125(d)(1)(A).  The ACPA sets forth factors to consider to determine bad faith.  Id. § 1125(d)(1)(B)(i).  These factors are not "an exclusive list."  Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 946-47 (9th Cir. 2002). Rather,"the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress."  Id.

(quotation omitted).  The ACPA also contains a safe harbor provision, precluding a finding of bad faith "in any case in which the court determines that the person believed and had a reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).

As discussed above with respect to Ricks' motion for partial summary judgment, Ricks registered the bme.com website in March 2000, June 2005, October 2007, May 2008, and June 2008.  Ricks therefore must not have acted in bad faith in any of these registrations to sustain his reverse hijacking claim.[12]  Ricks' bme.com domain name is identical to the LLC's BME mark.  Consequently, to prevail on his reverse hijacking claim, Ricks would have to show that the BME mark was not distinctive or famous when he registered his domain name, and/or that he did not act in bad faith.

### 1.  Distinctive

A person is liable for cybersquatting only if the mark upon which the domain name allegedly infringes was "distinctive at the time of registration of the domain name."  15 U.S.C. § 1125(d)(1)(A)(ii)(I); Lahoti, 586 F.3d at 1197.  Marks generally are classified in one of five categories: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).  Suggestive, arbitrary, and fanciful marks are inherently distinctive and thereby automatically entitled to federal trademark protection because "their intrinsic nature serves to identify a particular source of a product."  Id.  A descriptive mark is not automatically entitled to trademark protection, but may become protectable if the mark has acquired distinctiveness through

---

[12]  Ricks argues that under the ACPA, his reverse hijacking claim may succeed if he shows either that his registration or his use were not unlawful.  Ricks does not attempt to defend his registration or use beyond arguing that at the time of the registrations and alleged trademark infringement, the LLC did not own the BME mark.  (Pl.'s Opp'n (Doc. #95) at 22.)  As discussed below, issues of fact surrounding the LLC's ownership of the mark are irrelevant for purposes of determining whether Ricks may establish his reverse hijacking claim.

secondary meaning.  Zobmondo Entmt., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C. § 1052(f)).

The Court previously ruled that Ricks has not demonstrated, as a matter of law, that the BME mark is generic.  The Court now further concludes that, even viewing the facts in the light most favorable to Ricks as the nonmoving party, Ricks has failed to raise a genuine issue of material fact that the BME mark is generic, for the same reasons as set forth above.  The question thus becomes whether the BME mark is arbitrary, fanciful, suggestive, or descriptive.

The mark is neither arbitrary nor fanciful, as the mark is meant to be, at least in part, an acronym for BMEZine.  See Lahoti, 586 F.3d at 1197 (giving examples of fanciful or arbitrary marks such as the mark Exxon for gas and Xerox for copiers).  The question thus is whether the BME mark is suggestive or descriptive.

Whether a mark is suggestive or descriptive depends on the goods or services with which the mark is associated.  Zobmondo , 602 F.3d at 1114.  Consequently, the Court must determine the mark's classification in context, "by reference to the goods or services that it identifies."  Id. (quotation omitted).

Distinguishing between suggestive and descriptive marks sometimes is a simple task.  For example, "if a restaurant chain sought a trademark in a name such as 'Delicious Foods,' or a taxicab company sought a trademark in the name 'Reliable Cab,'" such marks would be descriptive.  Lahoti, 586 F.3d at 1197.  Other times, however, the line between suggestive and descriptive marks is not as easy to draw.  Zobmondo, 602 F.3d at 1114.

To assist in the determination, courts generally apply two tests, the "imagination" test and the "competitors' needs" test.  The primary test is the imagination test, which "asks whether imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced."  Id. at 1115.  For example, the mark "ENTREPRENEUR" for a magazine is descriptive because "an entirely unimaginative,

literal-minded person would understand the significance of the reference." Id. (quotation omitted)).  In contrast, the mark "ROACH MOTEL" is suggestive because an ordinary consumer would imagine "a fanciful abode for roaches in an establishment normally frequented by human [travelers]." Id. (quotation omitted).  In other words, a suggestive mark "does not describe the product's features, but suggests them," while a descriptive mark describes the good's or service's qualities or characteristics. Id. at 1114 (emphasis and quotation omitted).

The competitors' needs test looks at the extent to which competitors actually need the mark in question to identify their goods or services. Id. at 1117.  "If competitors have a great need to use a mark, the mark is probably descriptive; on the other hand, if the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods or services[,] this tends to indicate that the mark is merely suggestive." Id. (quotation omitted).  The two tests are interrelated, because the "more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." Id. (quotation omitted).

Using the imagination test, the Court concludes the consumer needs to use little to no imagination to determine the nature of the product or services the LLC offers under the BME mark when considered in context of the LLC's actual website.  The consumer must make the mental leap from the acronym BME to the name of the business, BMEzine, or Body Modification Ezine.  But no further leap is required.  While Shannon Larratt expressed a further meaning in the BME mark to include "Be Me," the play on the acronym's potential dual meaning does not, by itself, render the mark suggestive rather than descriptive.

The competitors' needs test is less helpful in this situation largely because the parties have produced no evidence that a single competitor describes itself as a body

modification ezine.  Thus, it is unclear whether the LLC has any direct competitors.

Presuming some form of competition exists in terms of web sites or online communities

which provide information on body modification, including photo sharing and an interactive

community, there is no evidence that any such competitor has a great need to use the BME

mark, either as an acronym or the words "body modification ezine."  While a competitor

likely would need to use the words "body modification" to describe the content of its

products or services, it is not clear that a competitor would need to use the term "ezine."

The fact that the parties have presented no evidence that a competitor in fact has needed to

describe itself by reference to the mark's terms suggests that no need exists.  However, that

lack of use may be indicative of a lack of competition, rather than a lack of need to use the

mark if actual competitors existed.

Because the imagination test is the primary test, the Court concludes that the

BME mark, in the context of a mark for Body Modification Ezine, is descriptive, not

suggestive.  Consequently, the mark is entitled to trademark protection only if it has

acquired a secondary meaning.

A descriptive mark may be distinctive, and thus entitled to trademark protection,

if it "has become distinctive of the applicant's goods in commerce."  15 U.S.C. §§ 1052(e),

(f).  Acquired distinctiveness is known as "'secondary meaning.'"  Two Pesos, Inc., 505

U.S. at 769.  A descriptive mark acquires secondary meaning when the consuming public's

mind associates the mark with the producer of goods or services, rather than with the goods

or services themselves.  Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 873

(9th Cir. 2002).  To determine whether a mark has acquired secondary meaning, the Court

evaluates various factors, including:

> (1) whether actual purchasers of the product bearing the claimed
> trademark associate the trademark with the producer, (2) the degree
> and manner of advertising under the claimed trademark, (3) the length
> and manner of use of the claimed trademark, and (4) whether use of the
> claimed trademark has been exclusive.

Id. (quotation omitted).  A weak descriptive mark will require a stronger showing of secondary meaning.  Id.  Whether a mark has acquired secondary meaning is a question of fact.  Id.

The evidence before the Court establishes that the consuming public associates the BME mark in the context of the body modification market as being associated with BMEzine as a source identifier rather than as an identifier of a class of goods.  The LLC has presented evidence from Vidra, Angel, Wimberly, and Falkner that the consuming public associates "BME" as a source-identifier with BMEzine, and Ricks has presented no contrary evidence.  There is no evidence regarding the degree and manner of advertising under the BME trademark beyond BMEzine's existence and use of the BME mark for many years on the various websites which use a "bme" prefix, such as bmeshop.  However, as discussed previously, independent media sources outside the body modification community referred to BMEzine as "BME."  The LLC has presented evidence that it or its predecessors have used the BME mark since the mid-1990s, and has licensed use of the BME mark in relation to the bmeshop website.  No evidence has been presented that any entity other than BMEzine has used the BME mark in connection with body modification products or services.  No genuine issue of material fact remains that the BME mark was distinctive as a descriptive mark which acquired secondary meaning before March 2000.  Ricks therefore will not be able to prevail on his reverse hijacking claim by showing the BME mark was not distinctive prior to his allegedly infringing conduct.

## 2.  Bad Faith

The statutory factors evaluating bad faith are as follows:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

37

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

       (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

       (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

       (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

       (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

       (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

      Ricks has presented no evidence that he owns a trademark or other intellectual property rights in bme.com. Ricks made no bona fide noncommercial or fair use of the bme mark or the bme.com website. Ricks originally used the domain to offer bona fide commercial services when he initially registered it in March 2000, as he used it merely to direct traffic to his motherboards.com website through which he sold computer components. However, Ricks subsequently "parked" the site, receiving pay-per-click fees during which time the site hosted links labeled, among other things, for tattoos, body piercing, body jewelry, and body modification.

      Although intent usually is a fact question, the circumstances compel the conclusion that Ricks intended to divert consumers from the LLC's bmezine.com website to bme.com for commercial gain through confusing similarity in the marks and content. The

bme.com domain name consists of the name the LLC commonly uses to identify itself. After Ricks converted the site to pay-per-click, the site included links to topics related to body piercing, tattooing, and body modification, and featured pictures of women with tattoos or a man giving another person a tattoo.  The bme.com website contained these links and pictures to profit off of confusion by web users seeking out BMEzine based on the LLC's mark.  Ricks offers no explanation for how these types of links and pictures were selected for the bme.com site, as opposed to links for some other type of service or product. Ricks was aware of some customer confusion, as he admitted receiving email through the bme.com website which sought to reach BMEzine's customer service, rather than his own website.  Ricks acknowledges he viewed the BMEzine website, likely in response to this email, and thus was aware of the BMEzine website content.  Ricks could have advised the parking company to change the links on bme.com but did not do so.  Indeed, Ricks testified he would not do so unless and until he received a cease and desist notice.  (Def.'s Exs., Ex. B at 142.)

Although Ricks argues the BME mark lacks distinctiveness, the evidence presented establishes that the mark was distinctive within the body modification community.  Ricks intended to profit off of the mark's distinctiveness to the body modification audience by providing pay-per-click links associated with body modification, the very distinctiveness which he now disclaims.  That bme.com's content consisted of tattoo, piercing, and body modification was no accident or coincidence.  Ricks did not place other content on the site that might correspond to another meaning for the three letters "bme."

Ricks' bad faith is evident when considered in the context of Ricks' history and knowledge.  Ricks previously has been found to have registered, trafficked in, or used domain names in bad faith.  See, e.g., Rewe Touristik Hotels & Investment GmbH v. Gee Whiz Domains Privacy Servs. & Gregory Ricks, WIPO Case No. D2008-1342 (Oct. 29,

2008) (finding bad faith registration and use of lti.com); Digital Spy Ltd. v. Moniker Privacy Servs. & Express Corp., WIPO Case No. D2007-0160 (Apr. 4, 2007) (finding bad faith registration of digitalspy.com); Philip Morris USA Inc. v. Domain Admin., WIPO Case No. D2005-0108 (Mar. 24, 2005) (finding bad faith registration of virginiaslims.com); Welch Foods, Inc. v. MSS, WIPO Case No. D2001-1065 (Dec. 17, 2001) (finding bad faith registration of welches.com). Ricks therefore should have been aware that his conduct in placing body modification content on the bme.com website and re-registering the site thereafter might be unlawful. Instead of altering the content to avoid possible infringement, the bme.com website became increasingly focused on body modification content. No genuine issue of material fact remains that Ricks will not be able to demonstrate his conduct was not unlawful.[13]

The parties dispute, however, whether Ricks must show his conduct was not unlawful as to the mark owner, or whether he must show his conduct was not unlawful as to the party in whose favor the domain name was transferred in the WIPO proceeding. In most cases, the mark owner will be the party who prevailed in the WIPO proceeding. Here, however, as stated above, a genuine issue of material fact remains as to whether the LLC owned the BME mark at the time of the alleged infringing activity. Consequently, Ricks argues that because a genuine issue of fact remains as to whether his conduct was "not unlawful" as to the LLC, a genuine issue of fact remains with respect to his reverse hijacking claim.

---

[13]  The evidence on Ricks' offer to sell the bme.com website to the LLC as the mark owner is equivocal. Ricks advised Shannon Larratt the website was not for sale, and sought no funds for the domain name at that time. When Rachel Larratt sought to purchase the domain name in late 2007 and early 2008, Moniker acted as a middleman between Rachel Larratt and Ricks. No evidence demonstrates that Ricks, rather than Moniker, continuously raised the price on the domain name. Further, the evidence related to the registration information is not definitive. Ricks did not provide false or misleading registration information, but he did change that information frequently. Ricks has offered explanations for each of these changes.

1    The ACPA's text does not clearly resolve whether, to sustain a reverse domain

2  name hijacking claim, the registrant must show his conduct was not unlawful as to the

3  person to whom the domain name was transferred, or whether he must show his conduct

4  was not unlawful generally.  The Act requires notice of the suit to the mark owner.  But as

5  to the fourth requirement, the Act requires the registrant to show his conduct was "not

6  unlawful," without specifying whether the registrant must make this showing as against the

7  entity to whom the domain name was transferred, or as against the world.

8    Because the registrant in a reverse domain name hijacking case seeks equitable

9  relief from the Court in the form of an injunction returning the domain name to him, he

10  must come to the Court with clean hands.  Cf. U.S. v. Kaczynski, 551 F.3d 1120, 1129 (9th

11  Cir. 2009) (holding criminal defendant had unclean hands and could not seek return of his

12  property even if property was not itself contraband).  "This maxim is a self-imposed

13  ordinance that closes the doors of a court of equity to one tainted with an inequitableness or

14  bad faith relative to the matter in which he seeks relief, however improper may have been

15  the behavior of the defendant."  E.E.O.C. v. Recruit U.S.A., Inc., 939 F.2d 746, 752 (9th

16  Cir. 1991).

17    Having acted in bad faith, the Court will not return the bme.com website to Ricks

18  even though an issue of fact exists as to whether Defendant LLC owned the BME mark at

19  the time of the alleged infringement.  Ricks comes to the Court with unclean hands

20  regardless of who actually owned the BME mark at the time of Ricks' conduct, and he

21  therefore will not be heard to seek return of the very website he registered in bad faith.

22    As a matter of law, Ricks cannot establish his conduct was not unlawful under

23  the ACPA.  The Court therefore will grant Defendant LLC's motion for summary judgment

24  on Ricks' reverse hijacking claim.

25  ///

26  ///

41

**B.  Fraud in Domain Dispute Proceeding**

Ricks' second cause of action alleges the LLC committed fraud in the domain dispute proceeding because it instituted and maintained the proceeding when it did not yet own the rights to the BME mark.  The LLC responds that it owned the rights to the mark, and even if it did not, Ricks cannot show the requisite intent to support this claim.

Under the ACPA, if a registration authority transfers, disables, or cancels a domain name "based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark," the domain name registrant may recover damages against the person making the misrepresentation.  15 U.S.C. § 1114(2)(D)(iv).  The domain name registrant also may obtain injunctive relief, including transfer of the domain name.  Id.

No genuine issue of material fact remains that Ricks will not be able to prevail on this claim.  By its plain terms, the statutory section provides for a cause of action for a knowing and material misrepresentation that a domain name is identical to, confusingly similar to, or dilutive of a mark.  It does not provide a cause of action for a knowing and material misrepresentation regarding ownership of that mark.  Even assuming Ricks had sufficient evidence to raise an issue of fact that Rachel Larratt knowingly misrepresented the ownership of the BME mark, that is not the type of misrepresentation punishable by this section.  Ricks contends the section clearly was intended to reach misrepresentations by trademark owners, but the statutory section neither limits the persons to whom it applies, nor broadens the subject matter to include misrepresentations about ownership.  The plain language of § 1114(2)(D)(iv) covers misrepresentations by any person, but only misrepresentations about whether the domain name is identical to, confusingly similar to, or dilutive of a mark.  The Court therefore will grant Defendant's motion for summary judgment on count two of Ricks' First Amended Complaint.

///

### C.  Fraud in Registration/Cancellation of Mark

Ricks' third claim for relief is for fraud in the registration of the BME mark. Ricks' fourth claim is for cancellation of the BME mark due to fraud in the application to obtain the mark.  Ricks alleges that Rachel Larratt knowingly misrepresented the LLC's ownership in the BME mark because at the time the LLC applied to the PTO for the mark, it was embroiled in a dispute with Shannon Larratt over who owned the mark.  The LLC moves for summary judgment on this claim, arguing it always has owned the BME mark, and therefore there was no fraud.  The LLC also argues that even if it did not, Ricks cannot produce evidence raising an issue of fact that any such false statement was knowingly made with the requisite intent.

Pursuant to 15 U.S.C. § 1120, any person who procures PTO registration of a mark "by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."  To prove a federal trademark was procured by fraud, the plaintiff must prove:

> (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance.

Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 874 (10th Cir. 1995) (quotation omitted). The question is not whether the statement is factually false, but whether the applicant subjectively believed it was false at the time he or she made the representation.  Id.  If this showing is made, the mark's registration may be cancelled. 15 U.S.C. § 1064(3).  "[T]he burden of proving that a party fraudulently procured a trademark registration is heavy." Robi v. Five Platters, Inc., 918 F.2d 1439, 1444 (9th Cir. 1990).

///

No genuine issue of material fact remains that Ricks will not be able to meet his heavy burden of showing Rachel Larratt, on behalf of the LLC, made a false representation in obtaining the BME trademark.  Rachel Larratt consistently maintained her belief that the LLC owned the rights to the BMEzine business and its related intellectual property.  She testified under oath that at the time she made the ownership statement in support of the PTO application, she believed the LLC owned those rights.  That she and her husband disputed the ownership does not show that she knew or believed her representation that the LLC owned the mark was false.  She disputed, and continues to dispute, Shannon Larratt's ownership claims.  Moreover, she testified that the parties had reached a verbal settlement regarding their ownership dispute prior to the PTO application being filed.  The Court therefore will grant Defendant's motion for summary judgment on counts three and four of the First Amended Complaint.

### D.  Request for Sanctions and Attorney's Fees

The Court will deny Defendant LLC's request for sanctions under Federal Rule of Civil Procedure 11 as Defendant has made no showing of compliance with the Rule.  The Court also will deny the request for attorneys' fees under 15 U.S.C. § 1117(a).  Attorneys' fees are available in exceptional cases, such as "where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful."  Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1023 (9th Cir. 2002).  The case is not exceptional for the claims upon which Defendant is the prevailing party.  Defendant has shown only that Ricks is not entitled to prevail on any of his claims against the LLC.  Defendant has not established Ricks' conduct was malicious, fraudulent, deliberate, or willful as to Defendant LLC with respect to the claims upon which Defendant LLC has prevailed at this stage of the proceedings.  The Court's ruling is without prejudice to a future request for attorneys' fees, should Defendant prevail on its claims against Ricks.

///

## VIII.  CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff/CounterDefendant Gregory Ricks ("Ricks") and CounterDefendant Gee Whiz Domains, Inc.'s ("Gee Whiz") Motion for Partial Summary Judgment (Doc. #55) is hereby DENIED.

IT IS FURTHER ORDERED that Third Party Defendant Gee Whiz Domains, Inc.'s Motion for Summary Judgment (Doc. #56) is hereby DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Its Counterclaims (Doc. #57/Doc. #61) is hereby DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. #59/Doc. #62) is hereby GRANTED in part and DENIED in part.  The motion is granted as to counts one, two, three, and four of Plaintiff Ricks' First Amended Complaint. The motion is denied to the extent it requests sanctions or attorneys' fees.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (Doc. #67), is hereby GRANTED in part and DENIED in part.  The motion is granted as to the Walters declaration.  The motion is denied in all other respects.

IT IS FURTHER ORDERED that the parties shall file the proposed joint pretrial order within thirty (30) days from the date of this Order.

DATED: July 26, 2010

_____
PHILIP M. PRO
United States District Judge